701 So.2d 922 (1997)
STATE of Louisiana
v.
Manuel ORTIZ.
No. 96-KA-1609.
Supreme Court of Louisiana.
October 21, 1997.
Rehearing Denied November 21, 1997.
*924 Martin E. Regan, Jr., New Orleans, for applicant.
Manuel A. Ortiz, pro se.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Metairie, Terry M. Boudreaux, Gretna, for Respondent.
MARCUS, Justice.[*]
Manuel Ortiz was indicted on two counts of first degree murder for the murders of Tracie Williams Ortiz and Cheryl Mallory, in violation of La. R.S. 14:30. After trial by jury, defendant was found guilty as charged on each count. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant on each count. The trial judge sentenced defendant to death in accordance with the recommendation of the jury.
*925 On appeal, defendant relies on thirty-one assignments of error for reversal of his convictions and sentences.[1]

FACTS
At about 7:00 P.M. on the evening of October 23, 1992, neighbors of Tracie Williams Ortiz, the wife of the defendant, found her severely injured and lying face down in an alley leading from her condominium at 901 Vouray Street in Kenner, Louisiana. Tracie, a black woman, had married the defendant in May of that same year. She told them that she had been stabbed and robbed and that her friend was inside the condominium. An emergency call was made to the police, but Tracie died before help arrived. When Jefferson Parish officers Christy Parker and Lynn Able got to the scene, they found Cheryl Mallory wounded inside. She had been shot twice and died at the scene after efforts to resuscitate her proved unsuccessful. The officers found no signs of forced entry and it did not appear to them that the residence had been ransacked. Family members testified at trial that nothing appeared to be missing from Tracie's home.
Shortly after the arrival of the police, the defendant's nephew arrived and spoke to the neighbors who had discovered the body outside. He told them that Tracie had called him that evening and asked whether his uncle, her husband, had given the key to the condominium to anyone because she thought certain items in the home had been disturbed. While they were talking, Tracie screamed and the phone went dead. He immediately drove to the scene but it was too late to render any assistance. He expressed concern that the police might think that his uncle was responsible and reported that his uncle was out of the country at the time.
The coroner, Dr. Susan Garcia, testified that Tracie died from a fatal stab wound to her left breast. She was also stabbed in the back and had defensive wounds on her arms and hands. Cheryl Mallory died from a gunshot wound to her left chest. She had a second gunshot wound to her abdomen, from which a medium caliber copper-jacketed Hydroshock bullet was removed. Another spent Hydroshock bullet also found on the second floor of the condominium. Both of these bullets bore markings indicating that they could have been fired from a Glock nine millimeter pistol.[2] Neither the neighbors that found Tracie nor anyone else testified to having heard any gunshots or sounds of a struggle, possibly indicating that a silencer had been used on the gun that killed Cheryl Mallory.
The morning after the murders, Detective Bill Mouret and others conducted a "perimeter search" near the condominium. In the backyard of an adjoining condominium, police found a Glock nine millimeter magazine (fully loaded with Remington cartridges) and a brown gardening glove on an exposed shelf that held painting materials. A Clerke .22 caliber revolver, later determined to have been lent to Tracie by her brother-in-law, was found just under the porch of a shed in the adjoining yard. A fence separating this yard from the yard of the home directly behind the victim's was chipped, suggesting that someone might have climbed it in haste. In the next yard police found another brown gardening glove that appeared to match the first one found. From the path along which possible evidence of the crime was found, police eventually concluded that the murderer may have escaped through a vacant lot in the next block behind the victim's home. Eight days after the murder, on October 31, 1992, police conducted a thorough search of the vacant lot and discovered a Gerber Mark I tactical knife in a sheath. It appeared that identifying marks on the knife had been ground off near the hilt. DNA testing on minute traces of blood found on the knife indicated that it was the weapon used to *926 murder Tracie. The gun used to murder Cheryl Mallory was never recovered.
Further investigation by the police revealed that Tracie, accompanied by the defendant, had purchased two Glock pistols in July, 1992. The Wal-Mart employee who approved the sale testified that Tracie was consulting with the defendant throughout the purchase. An employee from another Wal-Mart location testified that Ortiz had purchased a Glock nine millimeter pistol in May, 1992 and a Glock 40 caliber pistol on September 3, 1992.
While investigating additional gun transactions at a Chalmette sporting goods store, one of the employees, Vickie Billiot, volunteered that on October 17, 1992, just six days before the murders, she had shown a Gerber Mark I tactical knife to the defendant which he purchased along with a Baretta pistol. This was the same type of knife that had been found in the wooded lot near the murder scene. At trial, defense counsel attempted to prove that Ortiz had purchased a different type of Gerber knife and not the tactical model with serrated edges identified as one of the murder weapons. The testimony reflected that very few knives of this model are sold by the manufacturer to stores in this region and no sales in Louisiana were recorded at all in 1992. In fact, only 18 knives of this type were sold in the region that year, all shipped to Texas. However, an independent Gerber sales representative testified that he had sold two of the relatively rare knives in question to the Chalmette store out of his sample inventory. Ms. Billiot was steadfast in her testimony at trial that she definitely sold the Gerber Mark I tactical model with serrated edges to the defendant on October 17, 1992.
During the course of the investigation, agents from the FBI put the Kenner police in touch with Carlos Saavedra, who later proved to be the state's most important witness. Saavedra told the police during the investigation and testified at trial that he had known the defendant, Manuel Ortiz, in connection with some mechanic work Ortiz had done on one of his cars. They had also been involved in the joint purchase of a fax machine. Some time in 1992 before June, Ortiz had approached him to become involved in a scheme in which members of the Latin community would purchase vehicles for a small down-payment, insure them against theft, falsely report them as stolen, collect the insurance proceeds, and resell the vehicles in Central America. Saavedra, a long-time informant for the government, actually accompanied Ortiz to look at an Isuzu that Saavedra was to purchase as part of the insurance fraud scheme. The vehicle purchase was not completed but Ortiz proposed that same afternoon that Saavedra take part in a larger scheme. Ortiz suggested that Saavedra murder someone that Ortiz had heavily insured in exchange for part of the life insurance proceeds that would be payable. Saavedra reported the suggested scheme to his contacts with the FBI in June, 1992.
Throughout July and August of 1992, Saavedra continued to report to the FBI on his conversations with Ortiz about the proposed deal. He played along with the scheme, tried to find out the identity of the proposed victim and attempted to bring in an undercover FBI agent. In the course of the negotiations, Ortiz told him that the proposed victim would be a black female, living in Kenner, who played tennis,[3] worked out and was athletic. He indicated that he would send Saavedra a packet of materials with a key to the victim's residence and information on the victim's activities. Ortiz asked that he determine when he would commit the murder and tell Ortiz in advance so he could arrange to be out of the country at the time. Ortiz told him that he would provide the murder weapon. At first Ortiz suggested a gun and silencer. Later he told Saavedra he wanted him to stab the victim and make it look like a sexual assault and robbery.
Throughout these discussions, Saavedra was reporting to FBI agents, who testified at trial substantiating Saavedra's story. The negotiations broke down by early September, 1992 because Ortiz did not want to bring in a *927 third person from Texas as Saavedra was proposing (the undercover FBI agent), to help commit the murder. Ortiz told Saavedra that he might bring in a hit man from El Salvador known as "Hercules" to do the job.
Thirteen days after the murders, Detective Mouret contacted Ortiz, who had left for El Salvador the day before the murders and was still there.[4] Ortiz asserted that he did not know what had happened to his wife, even though he admitted having spoken to the nephew who had been at the crime scene. When told that his wife was dead, he advised the detective that he would return to the United States in about ten days when he had completed his business in El Salvador. Ortiz was arrested in Miami when he reentered the country.
Shortly after Ortiz was arrested, police obtained a warrant to search his luggage and the home of his parents, which he had listed as his residence when arrested and where he received mail. In the garage, detectives found and seized a grinding wheel. The residue from the grinding machine was later identified by the state's forensic metallurgist as containing debris consistent with the 440C stainless steel used in the manufacture of Gerber Mark I tactical knives. The shape of the wheel was also consistent with its having been used to grind identifying marks off of the knife found in the wooded lot. In a locked tool box underneath the grinder, police found original insurance policies on the life of Tracie and "six torn pages" (some of which were written in Spanish) indicating that an Isuzu truck had been driven over the El Salvadoran border by Ortiz on June 17, 1992. Ortiz had participated in reporting the theft of the same Isuzu, owned by his wife, on July 6, 1992.[5] In defendant's luggage, police found an address book with the phone number of Carlos Saavedra, various insurance papers, and a document related to the importation of the Isuzu into El Salvador. Some of the mail recovered from his luggage was addressed to Ortiz shortly after the murders at addresses other than the Vouray condominium and was also being forwarded. Evidence was presented that about two weeks before the murders, he had rented another apartment in Jefferson Parish.
As part of the Isuzu theft report, defendant reported that at the time of the theft, the vehicle contained nine guns, including several Glock pistols. Through further investigation, an FBI agent working in El Salvador was able to identify the same Isuzu reported stolen as being in the possession of Jamie Sol, a business partner of the defendant's brother. Sol purportedly obtained the vehicle as part of a business deal.
At trial New York Life Insurance agent, Mario Ramirez, testified that on May 6, 1992, Ortiz insured his own life, listing as his beneficiary a woman he identified on the policy as his cousin, Marta Vasquez.[6] At the end of May, 1992, Ortiz increased his term life policy to $350,000 and also purchased life insurance for his new wife, Tracie, in the same amount. The values on the polices were increased and separate whole life policies were purchased over the next few months. By the time of her death, Tracie's life was insured for a total of $900,000 in the event of accidental death (including death by murder). Ortiz was designated as Tracie's sole primary beneficiary.
Manuel Ortiz pleaded not guilty to the offenses charged. The prosecution presented various witnesses who testified to the facts set forth above. At the close of the guilt phase of the trial, the state asked the jury to find, based on the evidence presented, that Ortiz had orchestrated a murder-for-hire scheme in order to collect the insurance proceeds on Tracie's life. The state did not attempt to prove the identity of the person or *928 persons who actually wielded the murder weapons or the amount of money or other things of value offered to the alleged assassin(s).[7] The state relied primarily on the evidence of Ortiz's purchase of the relatively rare knife used to stab Tracie, his participation in the purchase of unrecovered Glock pistols consistent with the type of weapon used to murder Mallory, his designation as sole primary beneficiary on the life insurance policies on Tracie's life (totalling $900,000), and the testimony of Carlos Saavedra that just a few months before the actual murders, Ortiz had proposed a murder-for-hire insurance scheme to him in which the description of the victim and the manner of commission of the crime bore striking similarities to the crime actually committed. The testimony of Saavedra was substantiated by the testimony of the FBI agents to whom he was reporting the proposed murder prior to its occurrence. Saavedra's testimony was also corroborated by evidence that Tracie's Isuzu, which had been reported stolen, was taken to El Salvador by Ortiz and ended up in the hands of a business partner of Ortiz' brother, consistent with the auto-theft insurance fraud scheme Ortiz had also proposed to Saavedra.
Defendant attacked the credibility of Carlos Saavedra, primarily by attempting to prove that he was engaged in the illegal sale of Florida lottery tickets. He also tried to establish that he did not buy the knife found in the vacant lot. Finally, he attempted to convince the jury that he had always been "insurance conscious." Defense counsel tried to suggest through another witness that Carlos Saavedra had committed the murders.[8] However, he never offered an explanation for why Saavedra would have murdered Ortiz's wife or what he stood to gain by doing so, assuming Ortiz was not involved in a murder-for-hire plot with Saavedra.

TRIAL ISSUES

Assignment of Error No. 19
Defendant contends the trial judge abused his discretion by refusing a request to defer the defendant's opening statement until the close of the state's evidence. He argues that he was prejudiced by not having the opportunity to hear the state's evidence before opening, which resulted in defense counsel's exaggerating what he would be able to prove.
La.Code Crim. P. art. 765 provides in pertinent part:
The normal order of trial shall be as follows:...
(4) The opening statements of the state and of the defendant;
(5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument;....
The current version of the Louisiana Code of Criminal Procedure became effective in 1967. The official revision comments reflect that the format of La.Code Crim. P. art. 765 follows generally the format of the applicable provisions of Code Civ. P. art. 1632, except for the legislature's deletion of the portion of the civil procedure article that authorizes the court to vary the order of trial. While the trial judge may have inherent discretion in the management of the case before him to deviate from the normal order established by the legislature when sufficient justification is demonstrated, the legislature has indicated its intent to give less latitude for deviation in a criminal proceeding than in a civil trial. A defendant does not have a right to demand a deviation from the normal order of trial so that he can present his opening statement at the close of the state's evidence.
In the instant case, the only reason given by the defendant at trial for requesting that his opening statement be delayed was his representation to the trial judge that his opening statement would reveal to the state *929 the names of the witnesses he planned to call. However, the revelation of the identity of intended witnesses and defense strategy is a function of the content given to the opening statement by defense counsel rather than the timing of the statement. The same reason could be given for a request to deviate from the normal order of trial in every case.
In response to counsel's request, the trial judge cited La.Code Crim. P. art. 765 and indicated that he might deviate from the normal order if counsel could demonstrate "some circumstances that would justify it." Counsel was unable to articulate any further reason for a change in the normal order of trial.
On appeal, defendant argues that because he did not have the opportunity to hear the state's evidence before his opening statement, defense counsel made representations to the jury about what the defense would be able to prove that later proved incorrect. Our review of the record indicates that defense counsel did present evidence on most of the issues he discussed in the opening statement. However, even if defense counsel overstated his proof or speculated on what he would be able to establish on cross-examination of the state's witnesses, the consequences are not a product of the normal order of trial but are a product of the scope and content of the opening statement. Both the prosecution and the defense could doubtless fashion more accurate opening statements if they could prepare them with the benefit of a testimonial record. However, the order of trial has been established by the legislature with a view to giving the jurors a valuable preview of the case. Defense counsel can make good use of the opportunity to address the jury at the outset of trial without exaggerating his case or revealing the details of the defense. The trial judge did not err in refusing counsel's request to defer his opening statement until after the presentation of the state's evidence.
Assignment of Error No. 19 is without merit.

Assignment of Error No. 23
Defendant contends the trial judge erred in not granting his motion for mistrial during the testimony of Carlos Saavedra. He argues that he was prejudiced by Saavedra's assertion that he had received a death threat "from jail."
La.Code Crim. P. art. 771 provides that a mistrial may be granted on motion of the defendant when a comment of a witness is of such a nature that it might create prejudice against the defendant, if an admonition to the jury is not sufficient to assure the defendant a fair trial. When the trial court is satisfied that an admonition to the jury is sufficient to protect the defendant, that is the preferred remedy. A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
In the instant case, the prosecutor asked Saavedra how many times he had moved since his involvement as a witness in the case. Defendant made no objection to that inquiry. The witness answered that he had moved four or five times. Then, without a further question being asked, the witness volunteered:
And one time I was at a hotel, because they said that from jail they were going to send to kill me.
When the defendant objected to the unsolicited remark and moved for a mistrial, the trial judge responded by admonishing the jury as follows:
Ladies and gentlemen of the jury, the remark made by the witness in response to the question, that someone from the jail had said they would kill him, is improper, and you should disregard that and not consider that as part of the evidence in this case.
Mr. Blanco [the interpreter], instruct Mr. Saavedra that he should nothe should be directly responsive to the question; he should not volunteer information that's not required by the questions; and he should not tell us, generally speaking, he should not tell us what other people may have told him; other people that are not parties to this proceeding.
*930 Defendant argues that the admonition was not sufficient to protect him against the prejudicial inference that defendant was going to "arrange" for Saavedra's death, a crime similar to that for which he was being tried. We note, however, that in his opening statement, defense counsel himself volunteered that Saavedra would testify that he had asked to be put in the FBI witness protection program, because "we're worried about Manuel Ortiz killing me." The non-responsive remark of Saavedra which formed the basis of the motion for mistrial was a less prejudicial version of testimony predicted by the defense in opening statement. The unsolicited comment of Saavedra did not refer directly to the defendant.
The trial judge admonished the jury that the remark was improper and instructed the witness not to volunteer information in the future. We cannot conclude that the unsolicited response was so prejudicial that the court's admonition was insufficient to insure the defendant a fair trial, especially when the defense itself had already put the issue before the jury in its opening statement in much more explicit terms. The trial judge did not abuse his discretion in denying defendant's motion for mistrial.
Assignment of Error No. 23 is without merit.

Assignment of Error No. 29
Defendant contends the trial judge erred in denying his motion for post verdict judgment of acquittal based on alleged insufficiency of the evidence.[9] He argues that the evidence did not support a first degree murder conviction on either of the counts charged.
The constitutional standard for evaluating the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the state proved all of the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test to be applied when circumstantial evidence forms the basis of a conviction; all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Porretto, 468 So.2d 1142 (La.1985).
The Louisiana Legislature has defined first degree murder as the killing of a human being under any one of several specific listed circumstances. Coupled with each of the listed circumstances is the additional requirement that the offender have specific intent. The circumstances recited in defendant's first degree murder indictment and as to which the judge charged the jury were as follows:[10]
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated burglary...;....
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or
(4) When the offender has specific intent to kill or inflict great bodily harm and has offered ... anything of value for the killing.
(Emphasis added).

*931 The verdict for the murder of Tracie Williams Ortiz

The first circumstance asserted by the state to support defendant's conviction of the first degree murder of Tracie Williams Ortiz was that Ortiz was a principal to a murder committed with specific intent to kill while the perpetrator was engaged in the course of an aggravated burglary. In order to support a conviction pursuant to La. R.S. 14:30(A)(1), the evidence had to show that the perpetrator committed a felony-murder with specific intent to kill and that Ortiz was a principal to that act. La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. (Emphasis added).
Not all principals are automatically guilty of the same grade of the offense. We have held that in order to be a principal to first degree murder, an accused who did not physically commit the crime must be shown to have personally possessed the specific intent that the victim be killed. State v. West, 568 So.2d 1019 (La.1990); State v. Holmes, 388 So.2d 722 (La.1980).[11] In the instant case, the jury could reasonably have concluded based on the evidence that Ortiz shared with the assassin the specific intent to murder Tracie in accordance with the plan he had devised. The testimony of Carlos Saavedra demonstrated that Ortiz wanted Tracie dead in order to collect insurance proceeds approaching one million dollars. He concocted a plan whereby he would give a key to her home to a hit-man who would be paid a cut of the insurance money. He planned to provide the murder weapon and to be out of the country when the murder occurred. The crime occurred in substantial compliance with defendant's plan. Thus, there was sufficient evidence to support the specific intent component of the crime so that Ortiz could be found guilty as a principal to first degree murder if the crime was committed in the course of an aggravated burglary and he was a principal to the aggravated burglary.
La. R.S. 14:60 defines an aggravated burglary as the unauthorized entry of an inhabited dwelling with the intent to commit a felony therein if the offender is armed with a weapon upon entry, arms himself after entering, or commits a battery upon any person while inside or upon entering or leaving. To be guilty as a principal to a burglary, the offender does not have to personally enter the burgled building. State v. Kimble, 375 So.2d 924 (La.1979). And while possession of a dangerous weapon is an essential component of the commission of the aggravated burglary, a person may be a principal to the offense even though he did not personally have possession of the weapon used in the commission of the crime. See State v. Dominick, 354 So.2d 1316 (La.1978).
An essential element of the crime of aggravated burglary is "unauthorized entry." The only evidence offered suggested that defendant himself had lawful access to the premises. However, that did not prevent a finding by the jury that an unauthorized entry and aggravated burglary occurred under the particular facts and circumstances of this case. An "unauthorized entry" is an entry without consent, express or implied. State v. Dunn, 263 La. 58, 267 So.2d 193 (1972). In the case of a private dwelling, a person must have the consent of an occupant or an occupant's agent to constitute a defense to "unauthorized entry." This consent must be given by a person with the authority and capacity to consent. State v. Lozier, 375 So.2d 1333 (La.1979). However, even if a person has lawful access to enter a *932 premises himself, he is not empowered to grant lawful authority to another to enter for the purpose of committing a felony. In State v. Gendusa, 193 La. 59, 190 So. 332 (1939), cert. denied, 308 U.S. 511, 60 S.Ct. 133, 84 L.Ed. 436, we held that although a servant may have authority to enter a residence, where he conspires with another and allows entry so that his co-conspirator can commit a felony, both are guilty of burglary.
Of particular interest is the decision in Davis v. State of Mississippi, 611 So.2d 906 (Miss.1992). In that case, a husband charged as a principal to a burglary of his own home contested his conviction. He claimed that he had authorized his friend, Brown, to enter his home for the purpose of robbing and raping his wife. He argued that since there was no "unauthorized entry," there had been no burglary and, consequently, he could not be an accessory to that offense. The court soundly rejected such reasoning and explained:
While Davis had the authority to consent to Brown's entry into the trailer for a lawful purpose, by no stretch of reasoning could he be considered as having a right to authorize Brown's entry to rob and rape Mrs. Davis.
....
It would be monstrous to hold that Davis had any authority whatever to permit Brown to enter the trailer for the purpose of robbing and raping his wife, and having no such authority, his consent did not prevent Brown's entry from having been burglarious. 611 So.2d at 912.
Since Davis aided and abetted Brown in the burglary, he was equally guilty as a principal to the burglary. Other courts considering the issue have also concluded that one party with lawful access to a premises cannot grant lawful authority to another to enter to commit a felony against another occupant. Any purported permission given for such a purpose is without effect and does not prevent the entry from constituting a burglary.[12]
Just as in Davis, the person(s) who murdered Tracie cannot reasonably have believed that Ortiz had lawful authority to grant access to the premises for the purpose of murdering her. Accordingly, under the particular circumstances of this case, the jury could have found that the assassin did not have authority to enter the victim's residence.[13]
The final key element of the crime of burglary is that the accused must have had the intent to commit a felony at the moment of entry. State v. Lockhart, 438 So.2d 1089 (La.1983). The jury had sufficient evidence to warrant a conclusion that the murderer entered the residence with the intent to carry out the murder-for-hire plan hatched by Ortiz and that Ortiz aided and abetted him in doing so with the intent that Tracie be killed. The evidence suggested that Ortiz had given the assassin a key to the residence and provided information about the victim's activities. It was not necessary for the state to prove the identity of both principals in order to convict Ortiz of burglary; it was only necessary to prove that someone made an unauthorized entry with the requisite mental intent and that the accused was a person concerned in the commission of the crime. State v. Irvine, 535 So.2d 365 (La.1988).
Accordingly, the jury was entitled to return a verdict of first degree murder of Tracie Williams Ortiz pursuant to La. R.S. 14:30(A)(1). Defendant was a principal with specific intent to kill and aided, abetted and *933 procured another to commit a murder in the course of an aggravated burglary.
The second circumstance asserted by the state as a basis for the first degree murder conviction is that the offender had a specific intent to kill or inflict great bodily harm upon more than one person. La. R.S. 14:30(A)(3). There is no question that the assassin had the requisite specific intent and did, in fact, cause the death of more than one person. Whether or not he expected to find Cheryl Mallory in the condominium when he entered, he formed the specific intent to kill her once her presence was known. Thus, the evidence clearly established that the assassin was guilty of first degree murder by virtue of having caused the deaths of more than one person.
A more difficult question is whether Ortiz, as a principal to the crime, had the requisite specific intent to kill more than one person. A principal to a crime must personally possess the requisite mental intent required for the commission of the offense. State v. West, 568 So.2d 1019 (La. 1990). For purposes of the guilt phase of the trial, it was not sufficient for the jury to find that defendant merely created a risk of the death of more than one person. The statute required the jurors to find that defendant actively desired the result that followed from his actions.
The evidence supported the jury's conclusion that Ortiz procured someone to kill his wife, Tracie, in order to collect the proceeds of policies of insurance on her life. However, there was no evidence to suggest that Ortiz conceived of the death of Mallory as part of the insurance fraud scheme. Rather, the evidence suggested that Mallory was murdered simply because she happened to be at the condominium when the assassin appeared to kill Tracie. No evidence was adduced to suggest that Ortiz contemplated Mallory's presence at the condominium, much less her murder. Based on the evidence in this record, the jury could not have concluded beyond a reasonable doubt that Ortiz actively desired the death of Cheryl Mallory. Thus, the jury could not reasonably have found that he was a principal to a murder committed with the intent to kill or seriously injure more than one person. A verdict of guilty pursuant to La. R.S. 14:30(A)(3) was not warranted.
Finally, the state asserted that the first degree murder conviction was justified pursuant to La. R.S. 14:30(A)(4) because the evidence showed that Ortiz had specific intent to kill Tracie and offered something of value to someone else to induce the commission of the murder. The evidence that Ortiz paid or offered to give something of value to the assassin who actually accomplished the murder was circumstantial. However, Saavedra testified that less than two months before the murders, defendant was negotiating with Saavedra for Tracie's murder in exchange for 1/3 of the life insurance proceeds. Ortiz only broke off negotiations with Saavedra because Saavedra represented that he could not do the job alone and wanted to involve another person unknown to Ortiz. There was no evidence that Ortiz ever abandoned his murder-for-hire scheme. The last understanding of Saavedra was that defendant was going to bring in an assassin with para-military experience from El Salvador, who was known as "Hercules," to do the job in place of Saavedra. The fact that Saavedra was reporting these details of the planned murder to FBI agents months before its occurrence, and the fact that they testified to their numerous meetings with Saavedra corroborated Saavedra's testimony of the murder-for-hire scheme.
The crime was eventually committed less than two months after the cessation of these negotiations in a manner strikingly similar to that planned with Saavedra. The evidence supported the conclusion that Ortiz had purchased the murder weapon (a relatively rare knife) that killed Tracie just days before the murder. He also left the country right before the crime, just as he had told Saavedra he would. The jury was entitled to conclude that Ortiz arranged for someone to commit the crime. In our view, the circumstances were also sufficient to support the conclusion that he paid the assassin for the job. The only other hypothesis is that he found someone to commit the crime as a favor. In view of the prior negotiations with *934 Saavedra, the jury could have excluded this hypothesis as unreasonable. A jury is entitled to accept the prosecution's hypothesis of guilt based on circumstantial evidence, when it is consistent overall with the evidence, and where the defendant's circumstantial theory of innocence is remote. State v. Graham, 422 So.2d 123 (La.1982).
Defendant primarily argues that the first degree murder verdict is insupportable because the state's case rested heavily on the testimony of Carlos Saavedra, which he claims was so inconsistent and unreliable that it cannot be considered constitutionally sufficient to support his conviction. We disagree. While Saavedra's testimony may have been inconsistent in some instances and while he may have been impeached regarding his sale of Florida lottery tickets, his story regarding his conversations with Ortiz was corroborated by the FBI agents who testified that he was working with them and reporting the details of the murder-for-hire insurance fraud scheme throughout the summer before the murders. The fact that the crime was committed in substantial conformity with the plan he reported to the FBI substantiated Saavedra's testimony. Accordingly, there was sufficient evidence to convict defendant with the first degree murder of Tracie Williams Ortiz pursuant to La. R.S. 14:30(A)(4).

The verdict for the murder of Cheryl Mallory
While we are satisfied that there was sufficient evidence to support a first degree murder conviction for the murder of Tracie Williams Ortiz, we do not believe the same verdict was supported by the evidence as to the murder of Cheryl Mallory. We find no evidence in the record sufficient to support an inference that Ortiz ever offered anyone anything of value for Cheryl's murder. Thus, a first degree murder verdict was not warranted pursuant to La. R.S. 14:30(A)(4). Nor can we find defendant guilty of the first degree murder of Cheryl pursuant to La. R.S. 14:30(A)(3) by virtue of specifically intending the deaths of more than one person, for the same reasons articulated above regarding Tracie.
Finally, the evidence was not sufficient to support a finding that defendant was guilty as a principal to the first degree felony-murder of Cheryl pursuant to La. R.S. 14:30(A)(1). In certain cases, circumstantial evidence might justify a finding that the murder plan called for the elimination of persons other than the main target. However, the evidence of the plot to kill Tracie in this case did not extend to other victims. We can find no evidence to support a conclusion that defendant shared the specific intent to kill Cheryl that was doubtless formulated by the assassin after his entry into the condominium when he discovered Cheryl there with Tracie. The specific intent of the assassin to murder Cheryl cannot be automatically imputed to defendant. State v. Holmes, 388 So.2d 722 (La.1980). Therefore, defendant's first degree murder conviction and death sentence for the murder of Cheryl Mallory must be reversed.
Under State v. Byrd, 385 So.2d 248 (La.1980) and La.Code Crim. P. art. 821, the discharge of the defendant is neither necessary nor proper when the evidence supports a conviction on a lesser and included offense which was a legislatively authorized responsive verdict. La. R.S. 14:30.1 in pertinent part defines second degree murder as the killing of a human being when the offender is engaged in the perpetration of an aggravated burglary, even though there was no specific intent to kill. As noted hereinabove, there was sufficient evidence to conclude that defendant was a principal to the commission of an aggravated burglary, during which a second murder occurred, although he had no specific intent that Mallory be killed. Furthermore, second degree murder is a legislatively provided responsive verdict to first degree murder. La.Code Crim. P. art. 814. Thus, it is not necessary to remand this case for a new trial in order to convict defendant of the second degree murder of Cheryl Mallory.
Accordingly, we modify the jury verdict and render a judgment of conviction of second degree murder for the murder of Cheryl Mallory. We remand the matter to the trial court for sentencing on the modified judgement *935 of conviction. La.Code Crim. P. art. 821.

SENTENCE REVIEW
Article I, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim. P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) PASSION, PREJUDICE OR ANY OTHER ARBITRARY FACTORS
There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death sentence for the murder of Tracie Williams Ortiz. Defendant's contentions regarding the conduct of the prosecutor during closing argument to the jury and the effectiveness of defense counsel during the penalty phase of the trial have been considered by us and found to be either without merit or better suited to post-conviction review.

(b) STATUTORY AGGRAVATING CIRCUMSTANCES
The jury in its verdict found the following aggravating circumstances:
(a) The offender was engaged in (as a principal) the perpetration of an aggravated burglary. (La.Code Crim. P. art. 905.4 A(1));
(b) The offender knowingly created a risk of death or great bodily harm to more than one person. (La.Code Crim. P. art. 905.4 A(4));
(c) The offender offered something of value for the commission of the offense. (La. code Crim. P. art. 905.4 A(5));
(d) The offense was committed in an especially heinous, atrocious or cruel manner. (La.Code Crim. P. art. 905 A(7)).
As we explained hereinabove, the jury was justified in finding the aggravated circumstance set forth in La.Code Crim. P. art. 905.4 A(5). The evidence admitted, albeit circumstantial, was sufficient to support the jury's conclusion that the defendant offered something of value for the killing of his wife.
We need not address the other aggravating circumstances found by the jury because the failure of one aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings.[14]State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). Evidence that defendant was a principal to a murder committed in the course of an aggravated burglary was offered to prove one of the circumstances supporting his first degree murder conviction. Evidence of the manner of Tracie's death and the potential risk of harm to more than one person was part of the facts surrounding the murder. It is clear that the admission of this evidence did not interject an arbitrary factor into the proceedings.

(c) PROPORTIONALITY TO THE PENALTY IMPOSED IN SIMILAR CASES
Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup.Ct. R. 28, § 4(b) provides that the district attorney shall file with this court a list of each *936 first degree murder case tried after January 1, 1976 in the district in which sentence was imposed. The state's list reveals that fifty-seven first degree murder cases were tried in the Twenty-Fourth Judicial District Court for the Parish of Jefferson since January 1, 1976. Our research reveals that jurors in the Twenty-Fourth Judicial District have recommended the death penalty in thirteen cases since January 1, 1976.
Only one murder-for-hire case has been prosecuted by the district attorney in Jefferson Parish as a first degree murder case. In that case, State v. Parks, 422 So.2d 1164 (La.1982), the defendant wife conceived a plan to split life insurance proceeds on the life of her husband with her lover, who actually accomplished the murder according to their joint plan. The jury convicted the wife of second degree murder. Given the scarcity of comparable cases in Jefferson Parish, it is appropriate to look beyond the judicial district in which sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359.
Throughout the state since 1976, there have been relatively few murder-for-hire convictions in comparison to other first degree murder convictions. In most cases arising under La. R.S. 14:30(A)(4), a life sentence has been recommended.[15] However in State v. Smith, 600 So.2d 1319 (La.1992), a death sentence was imposed on the party who procured the services of another to construct an explosive device and affix it to the victim's car.[16] And we recently affirmed the conviction and death sentence of a defendant hired to kill the wife of another man. State v. Lavalais, 95-0320 (La.11/25/96); 685 So.2d 1048.
Although we recognize that the death penalty has been infrequently applied in cases involving murder-for-hire, this fact alone in not dispositive on the issue of proportionality. As we noted in Lavalais, we would forever preclude the possibility of imposing a death sentence in a murder-for-hire case if we held, based on the small sampling of cases available, that the imposition of a death penalty is disproportional simply because other juries recommended life in the preceding cases. It is also noteworthy that this case involved multiple murders. Louisiana juries have frequently recommended the death penalty in such cases. We do not find that defendant's death sentence is disproportionate.
The Uniform Capital Sentence Report and the Capital Investigation Report indicate that defendant is a white male born October 13, 1957 in El Salvador. He was 35 years old at the time of the offense. In 1979, defendant married a native El Salvadoran, Ana Eraheta. Before divorcing in 1991, they had one son who is now 15 years old. Defendant also has a son born out of wedlock a few weeks after the murders to Marta A. Vaquez. Defendant, who is not a United States citizen, emigrated to this country in 1980 and worked as a mechanic until 1988. Defendant married the victim, Tracie Ortiz, in May, 1992. The defendant had no criminal history.
After having considered the above factors, we are unable to say that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Hence, based on the above criteria, we do not consider that defendant's sentence of death for the murder of Tracie Williams Ortiz was cruel, excessive, or unusual punishment.

*937 DECREE
For the reasons assigned, defendant's conviction and death sentence for the murder of Tracie Williams Ortiz are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La. R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for applying for rehearing of denial of certiorari; or (d) that court denies his application for rehearing.
Defendant's conviction of first degree murder and his death sentence for the murder of Cheryl Mallory is set aside. The jury's verdict of first degree murder is hereby modified and a judgment of conviction of second degree murder is rendered. We remand the case to the trial court for sentencing on the modified judgment. La.Code Crim. P. art. 821.
NOTES
[*] Calogero, C.J., not on panel, recused. Rule IV, Part 2, § 3.
[1] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[2] Various other cartridges were also found at the scene. A .22 unspent cartridge was found under a second floor bed and 2 nine millimeter spent cartridges were found on the second floor, both of which also bore markings consistent with firing from a Glock pistol.
[3] Police found tennis gear on the ground floor of the condominium when they searched after the crime.
[4] Ortiz originally had a reservation to leave for El Salvador on the morning of the murders. He went to the airport one day early, changed his reservation and left the day before the murders.
[5] State Exhibit No. 157 is a police report showing Manuel Ortiz as the person reporting the theft of a new 1992 Isuzu Rodeo with temporary plates. The report includes the VIN number of the vehicle. Three Glock nine millimeter handguns were reported as having been stolen in the vehicle, as well as five other guns.
[6] At trial, Vasquez testified that she was not the cousin of Ortiz, but the mother of his illegitimate son born in El Salvador on Nov. 6, 1992, just two weeks after the murders. Ortiz was with her at the birth of the child.
[7] Twenty-three fingerprints were lifted at the crime scene. Twenty proved to be prints of either Tracie Williams Ortiz or Cheryl Mallory. The remaining three prints could not be identified. None were prints of the defendant.
[8] Defendant called as a witness Ena Rice. She testified that Carlos Saavedra told her that he had killed Cheryl Mallory and Ortiz had killed Tracie Williams. If taken as true, the statement implicates Saavedra but clearly does not exonerate Ortiz.
[9] Defendant filed a motion for post verdict judgment of acquittal pursuant to La.Code Crim. P. art. 821, properly raising the issue of the sufficiency of the evidence. It is clear that he is seeking review under the standards applicable to a motion for post verdict judgment of acquittal, notwithstanding inadvertent references to the trial judge's adverse ruling on a contemporaneously filed motion for new trial.
[10] Defendant did not object to the trial judge's charge to the jury and has not raised any assignments of error related to the jury charges. The jury returned a verdict of "guilty of first degree murder" on both counts of the indictment; it did not specify which of the specific circumstances listed in La. R.S. 14:30 it found applicable.
[11] Not all states require that a principal to a felony-murder share specific intent to kill the victim with the actual perpetrator. For a discussion of the varying state statutes, see Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), wherein the United States Supreme Court found that a sentence of death for a principal who did not physically commit the offense does not violate the Eighth Amendment prohibition of cruel and unusual punishment where the defendant was a principal who had substantial participation in the felony-murder and where his mental state was one of reckless indifference to human life (a lesser standard than specific intent). The statute at issue in Tison, unlike the Louisiana first degree murder statute, did not require specific intent to kill a victim murdered in the course of a felony.
[12] See Fotopoulos v. State, 608 So.2d 784 (Fla. 1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282; Damico v. State, 153 Fla. 850, 16 So.2d 43 (1943); K.P.M. v. State, 446 So.2d 723 (Fla.App.1984); People v. Harris, 33 Ill. App.3d 600, 338 N.E.2d 129 (1975); People v. Castile, 34 Ill.App.3d 220, 339 N.E.2d 366 (1975); Smith v. State, 477 N.E.2d 857 (Ind. 1985); State v. Upchurch, 332 N.C. 439, 421 S.E.2d 577 (1992); State v. Tolley, 30 N.C.App. 213, 226 S.E.2d 672 (1976), rev. denied, 291 N.C. 178, 229 S.E.2d 691.
[13] We note that it is the evil purpose of the party purporting to grant authority (Ortiz) that makes the grant invalid. This court has specifically rejected the argument that the concealed criminal intent of the party entering renders the entry unauthorized, in a case where the entry was otherwise authorized by a person with the capacity to consent and who did not authorize the entry for the purpose of facilitating the commission of a felony upon a co-occupant. State v. Dunn, 263 La. 58, 267 So.2d 193 (1972).
[14] We do not by our treatment of only one aggravating circumstance imply that one or more of the other aggravating circumstances found by the jury were invalid.
[15] See State v. Jones, 607 So.2d 828 (La.App. 1992); State v. Velez, 588 So.2d 116 (La.App. 3rd Cir.1991), writ denied, 592 So.2d 408 (La.1992), cert. denied sub nom., QuinteroCruz v. Louisiana, 505 U.S. 1220, 112 S.Ct. 3031, 120 L.Ed.2d 901; State v. Fleming, 574 So.2d 486 (La.App. 4th Cir.1991), writ denied, 592 So.2d 1313 (La. 1992); State v. Seward, 509 So.2d 413 (La. 1987); State v. Woodcock, No. 275-167 "I", as reported in State v. Koll, 463 So.2d 774 (La.App. 4th Cir.1985), writ denied, 467 So.2d 1131 (La.1985); State v. Ester, 458 So.2d 1357 (La.App. 2d Cir. 1984), writ denied, 464 So.2d 313 (La.1985); State v. Johnson, 438 So.2d 1091 (La.1983); State v. Whitt, 404 So.2d 254 (La.1981); State v. Sylvester, 388 So.2d 1155 (La.1980).
[16] The conviction was reversed by this court on other grounds. On retrial, the defendant was acquitted.