2CLARENCE E. McMANUS, Judge.

STATEMENT OF THE CASE

On May 21, 2001, the grand jury of St. John the Baptist Parish indicted defendant, Danny Winston, for the second degree murder of Sydonna Morris, a violation of LSA-R.S. 14:30.1, which allegedly occurred on January 5, 2001. Defendant was arraigned on May 23, 2001 and pled not guilty. On June 27, 2001, a sanity hearing was held, and the trial court found defendant competent to stand trial and to assist his defense counsel. On February 6, 2002, defendant was re-arraigned and pled not guilty and not guilty by reason of insanity. On May 21, 22, and 23, 2002, the case was tried before a jury which found defendant guilty as charged. On May 31, 2002, defendant filed a motion for post-verdict judgment of acquittal that was denied. Defendant filed a motion for new trial that was denied on July 2, 2002. On that same date, defendant waived sentencing delays, and the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On July 9, 2002, defendant filed a motion for appeal that was granted.
| ?FACTS
The state introduced evidence at trial which showed that on January 5, 2001, at approximately 7:30 p.m., defendant shot his live-in girlfriend, Sydonna Morris, and fled the scene.
Corporal Cleven Remondet III of the St. John Sheriffs Office testified that, when he arrived at the scene, he observed a black female lying on her back. He explained that the female had been severely beaten, that she had swollen eyes and blood dripping down her face, that she was gasping for air, and that medical personnel arrived and transported her to the hospital.
Corporal James P. Nolan III of the St. John Sheriffs Office testified that, when he arrived at the scene, he observed a black female with two swollen eyes and a wound in her forehead, a bullet easing, and *187 a pillow with blood on it and a hole in it. Felix Joseph, who was formerly a sergeant with the St. John Sheriffs Office, testified at trial, and his testimony largely corroborated that of Corporals Remondet and Nolan. Mr. Joseph also testified he interviewed the victim’s sister, along with two young children.
Dr. Paul McCarry, a forensic pathologist, testified that he performed an autopsy on Ms. Morris, that Ms. Morris had sustained a gunshot wound, that the wound appeared to be a contact wound, that the bullet had gone into her head above the inner end of her right eyebrow, that the bullet ended up in the left rear of her head inside the skull bone, and that she died from massive brain damage.
Sergeant Michael Davis, a crime scene technician with the St. John Sheriffs Office, testified that he took photographs of the scene, and that he collected evidence, including, but not limited to, a clip to an automatic weapon, a box of bullets, .380 caliber, and an empty box for a Jennings firearm. He explained that he was unable to view the body, because by the time he was notified that the victim had passed away, the autopsy had already been done.
|4M.F., Ms. Morris’s nephew, and J.E., Ms. Morris’s daughter, testified that, on the day in question, defendant told them to go into J.E.’s bedroom.[1] They further testified that defendant subsequently went into Ms. Morris’s bedroom with Ms. Morris, that M.F. and J.E. heard a loud “boom,” that defendant came out of Ms. Morris’s bedroom and shut the door, that defendant told them not to disturb Ms. Morris because she was sleeping, that defendant had his hand behind his back, and that defendant subsequently left the house. J.E. testified that she tried to open the door of her mother’s bedroom, but the door was locked, and that she heard her mother saying “hmmmm.” M.F. testified that he went to the door of Ms. Morris’s bedroom and heard a moaning sound.
Shannon Florent, Ms. Morris’s sister, testified that when she arrived at Ms. Morris’s house, the house was “trashed,” the telephone was unplugged, and that she kicked Ms. Morris’s bedroom door in to get to her.
Jay East, store manager for Cash America Pawn in LaPlace, testified that, on January 5, 2001, at approximately 3:05 p.m., defendant pawned some jewelry and borrowed $160.00.
Defendant testified that he and Ms. Morris were arguing on the day in question, that Ms. Morris threatened to kill herself, and that he could not remember anything else after that until he woke up in Ms. Morris’s car in Atlanta, Georgia. Defendant further testified that Ms. Morris had been threatening his wife and other girlfriend by calling them and writing them letters. Defendant also testified that he had bought a gun and cartridges at a pawn shop in the beginning of January 2001 for $100.00 to protect himself from Ms. Morris and her friends. Defendant testified that he could not dispute the testimony of J.E. and M.F. because he could not remember anything.
IfiDr. Harold Myron Ginzburg, a psychiatrist, testified that he examined defendant one year before trial, that a person who experienced a great shock or stress could lose his memory for a brief period of time, and that the condition was known as “acute stress reaction.” Dr. Ginzburg explained that he did not diagnose defendant as having acute stress reaction or temporary amnesia. He testified that defendant had told him that he had previously witnessed the deaths of his sister and mother. *188 Dr. Ginzburg explained that, if that history was true, then witnessing Ms. Morris’s death would have increased defendant’s risk for temporary amnesia. He further testified that he could not determine whether defendant knew right from wrong at the time of the shooting.
Debbie Parsons testified that she and defendant lived together from May of 1995 until October of 1996 or 1997, and from September of 1999 until April of 2000, and that they had a 10-year-old son. She testified that she had received a letter and telephone calls from Ms. Morris while Ms. Parsons and defendant were living together.
Muriel Crowley, records custodian for the St. John Sheriffs Office, identified a document, dated November 11, 1999, which showed that defendant had advised he was getting threatening telephone calls.

ASSIGNMENT OF ERROR NUMBER ONE

Defendant argues that the evidence was legally insufficient to convict him of second degree murder. He contends that the state’s evidence did not preclude a finding that the victim committed suicide upon learning that defendant was leaving the state and not returning to her. Defendant further asserts: (1) the state’s evidence was incomplete because the state failed to conduct the proper DNA tests on the victim’s hand and fingernails for gunpowder residue or for skin samples of her assailant; (2) J.E. and M.F. were coached to testify adversely to defendant; (3) the witnesses gave conflicting statements; (4) evidence was altered; (5) evidence pthat defendant fled the scene does not indicate guilt in light of his psychiatric condition; and (6) there was no evidence defendant abused the victim.
The defendant was convicted of second degree murder in violation of LSA-R.S. 14:30.1, which provides in pertinent part: “A. Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.”
In this case, defendant’s actions indicate he was planning to kill Ms. Morris. Defendant admitted buying a gun for $100.00 at a pawn shop within a few days, or even hours, before the shooting. He admitted going to a pawn shop a few hours before the shooting to obtain a loan of $160.00. Defendant went to Ms. Morris’s home and sent the children to another bedroom. He subsequently went into Ms. Morris’s bedroom where he was alone with Ms. Morris. The children’s testimony placed defendant in the room alone with Ms. Morris when the gunshot was fired. Defendant testified that he could not dispute the children’s testimony because he had temporary amnesia. Also, the officers testified that Ms. Morris had been severely beaten in addition to being shot, and the evidence suggested that a pillow was used to muffle the sound of the gunshot.
The evidence indicates defendant tried to cover up the crime. Defendant locked the door of Ms. Morris’s bedroom when he left. He told the children not to disturb Ms. Morris because she was sleeping, which gave him time to escape. Defendant had his hand behind his back so the children could not see what he was hiding when he left the house. Ms. Florent found the telephone unplugged and observed that the house had been “trashed.” Defendant fled the scene in Ms. Morris’s car.
Based on the foregoing, it could be reasonably inferred from the evidence that defendant planned to kill Ms. Morris, that he did Mil Ms. Morris, that he covered up the crime, and that he fled the scene. Even though defendant claims he 17does not remember shooting Ms. Morris, that does *189 not mean it did not happen, nor does it mean that defendant was insane at the time of the offense. Even assuming that defendant suffered from amnesia as a result of viewing Ms. Morris’s death, there was no evidence introduced at trial to show that defendant was insane, i.e., that because of a mental disease or mental defect defendant was incapable of distinguishing between right and wrong at the time of the shooting. LSA-R.S. 14:14. In fact, Dr. Ginzburg testified that he could not determine whether defendant knew right from wrong at the time the shooting occurred.
On appeal, defendant argues that the evidence does not preclude a finding that Ms. Morris killed herself upon learning that defendant was leaving her and not returning to her. However, it is reasonable to infer that Ms. Morris did not commit suicide, because it is highly improbable that she would put a pillow over her own head before shooting herself. Further, the issue of whether defendant killed Ms. Morris or whether Ms. Morris committed suicide was a factual matter to be determined by the jury. Here, the jury made a credibility determination and believed the testimony of the state’s witnesses rather than the defense -witnesses’ testimony. It is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence. State v. Rosiere, 488 So.2d 965, 968 (La.1986); State v. Sampson, 95-58 (La.App. 5 Cir. 5/30/95), 656 So.2d 1085, 1088, writ denied, 95-1665 (La.11/27/95), 663 So.2d 730.
Defendant argues that Ms. Morris threatened him, his wife, and his girlfriend, Ms. Parsons, on several occasions by telephone and by letter, that she would not let defendant visit with his child despite the fact she was preparing to sue him for child support, that Ms. Morris had threatened to kill herself if defendant ever decided to leave her, and that Ms. Morris was mentally unstable due to her failing relationship with defendant.
IsDefendant testified that Ms. Morris wrote him a letter, that the letter was not dated, and that he received the letter in October of 1999 while he was living in Mississippi. Ms. Parsons testified that she received a letter from Ms. Morris in late September or early October of 1999. Ms. Parsons further testified that the calls from Ms. Morris were received while she was living with defendant, from May of 1995 until October of 1996 or 1997, and from September of 1999 until April of 2000.
Ms. Crowley, the St. John Sheriffs Office records custodian, identified a complaint from defendant regarding threatening telephone calls. She testified that Ms. Morris’s name was not on the complaint, and that it was dated November 11, 1999. The evidence indicates that the telephone calls and letters to defendant and Ms. Parsons were irrelevant to show Ms. Morris’s state of mind at the time of her death, as they occurred more than one year prior to Ms. Morris’s death. Additionally, there was. no evidence of stalking, pursuing, or harassing at or near the time of the offense, other than defendant’s self-serving testimony that Ms. Morris had threatened to kill herself while they were arguing on the day of her death.
Defendant contends that the state’s evidence was incomplete for the following reasons: 1) the state failed to conduct the proper DNA tests on Ms. Morris’s hand and fingernails; 2) the bullet casing found .near the victim’s body was either not tested for fingerprints, or tested, but revealed no fingerprints; 3) the crime scene technician was not able to view the body prior to the autopsy; 4) no samples were taken from the victim’s body; 5) the items taken from the victim’s bedroom were not tested even though they were sent to the Louisi *190 ana Crime Lab to be tested; and 6) no forensic tests were conducted on the pillow to determine whose fingerprints were on the pillow, what material was found on the pillow, or whether the pillow was used to silence the gunfire.
Defendant cites no law which provides that the state must conduct tests for DNA or fingerprints. The law only requires the state to prove the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). Further, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions. State of La. in the Interest of L.A., 95-409 (La.App. 5 Cir. 12/13/95), 666 So.2d 1142, 1144.
Defendant suggests that J.E. and M.F. were coached to testify adversely to him. He states that, during cross-examination, M.F. testified that he practiced standing up and pointing at the defendant with the district attorney a few days before trial. Defendant also states that M.E. admitted she was coached by the district attorney to stand and identify defendant in court.
The record reflects that both M.F. and J.E. testified that they practiced standing up and pointing to defendant prior to trial. During closing arguments, the prosecutor addressed the allegation that he coached the witnesses. He stated that the children were reliable witnesses, that there was nothing to indicate that the children were lying or that anybody put words in their mouths or coached them, that he met with the children prior to trial in order to prepare them for trial, that he was not going to put the children on the stand for the first time on the day of trial in front of a judge, lawyers, and 13 strangers, and that preparing them for trial did not taint their identifications of defendant, because defendant was not someone they had met on the street one time; they already knew who defendant was because they saw him everyday. The prosecutor’s explanation for meeting with the children to prepare for trial and having them practice pointing at the place where defendant was going to sit appears reasonable.
Defendant next contends that J.E. and M.F., the only witnesses to the incident, gave conflicting statements to the police about how the shooting occurred, even though they were in another bedroom playing at the time of the shooting. Defendant states in his brief that defense counsel brought out in J.E.'s testimony that there was nothing in her transcribed statement to the police about any moaning J.E. heard from the victim's room.
The record reflects that, during J.E.’s testimony, J.E. testified that she told the police officer she heard a humming sound coming from her mother’s bedroom. When defense counsel stated that he did not see anything about that in the transcribed statement, the prosecutor said defense counsel was trying to testify. The trial judge told defense counsel to ask questions. Defense counsel again asked J'.E. whether she was sure she told the police officer about the humming, and she said “Yes.” Mr. Joseph (formerly Sergeant Joseph) testified that J.E. told him that she heard a humming sound coming from the room where her mother was. Defense counsel did not ask Mr. Joseph why the information regarding the humming sound was not in J.E.’s statement, nor was J.E.’s statement introduced into evidence. Additionally, there was no evidence that the other officers who testified interviewed J.E. or M.F.
*191 The statements of J.E. and Mr. Joseph do not conflict, because they both testified that J.E. told Mr. Joseph that J.E. heard a humming sound coming from her mother’s bedroom. Therefore, it is reasonable to conclude that the information regarding the humming was not in the transcribed statement, because J.E. told Mr. Joseph that information either prior to the recording of her statement or at some other time.
Another alleged discrepancy occurred, according to defendant, when J.E. testified that defendant left the apartment and drove off, but then later admitted on cross-examination that she did not see defendant get into the car. When asked who Intold her that defendant drove off in the car, J.E. testified, “No one. Cause I saw my mom’s car gone.” Apparently, J.E. assumed defendant took her mother’s car, because J.E. later saw that her mother’s car was gone. Therefore, J.E. provided a reasonable explanation for the conflict in her testimony.
Additionally, a review of the closing arguments and the pertinent testimony reflects other slight discrepancies in the testimonies of M.F. and J.E. M.F. testified that when he and J.E. went into J.E.’s bedroom, they played tic-tac-toe; however, J.E. testified that they did not play in the room, they just “sat around.” M.F. testified that defendant never drove them to school; however, J.E. testified that defendant did drive them to school in Ms. Morris’s car. J.E. and M.F. testified that M.F. called his mother after defendant left; however, Mrs. Florent testified that J.E. called her.
Although there were slight discrepancies in the testimonies of J.E. and M.F., the important parts of their testimonies were consistent. They both testified that defendant sent them to another room, that defendant went into the other bedroom with Ms. Morris, that they heard a “boom,” that defendant came out of the bedroom, that defendant told them not to disturb Ms. Morris, that defendant had his hand behind his back, and that defendant left.
Defendant suggests that the evidence was contaminated or altered. He states in his brief that Sergeant Davis testified that, at the time he viewed the body, there were certain modifications that the pathologist made to the victim’s body prior to him viewing the body, and that the victim’s forehead had been covered with some material from the mortuary in preparation for the funeral. The record reflects that Sergeant Davis did, in fact, make the above statements. However, there is no evidence to suggest that Sergeant Davis’s inability to view the body prior to the autopsy nor the modifications made to the forehead of the body prejudiced defendant.
Defendant argues that evidence that he fled the scene does not indicate guilt in light of his psychiatric condition, i.e., acute stress reaction. However, there was no evidence presented at trial that defendant did, in fact, suffer from acute stress reaction. Defendant claims that Dr. Harold Ginzburg testified that he diagnosed defendant as having acute stress reaction which was initiated when defendant witnessed the suicide deaths of his sister and mother at a young age, and that the acute stress reaction resulted in tern-porary amnesia.
However, contrary to defendant’s assertions, Dr. Ginzburg testified that he did not diagnose defendant as having acute stress reaction or temporary amnesia. Rather, Dr. Ginzburg testified that defendant had told him he had witnessed the deaths of his sister and mother at a young age. Dr. Ginzburg explained that, if that history was true, then witnessing Ms. Morris’s death would have increased defendant’s risk for a number of psychiatric *192 signs or symptoms, including temporary amnesia. Dr. Ginzburg further testified that defendant’s history was uncorroborated, and that he could not determine whether defendant knew right from wrong at the time of the shooting.
Further, even if defendant had acute stress reaction or temporary amnesia, and therefore, that flight after the shooting would not necessarily indicate guilt, there was substantial other evidence that tended to show defendant was guilty, especially the testimony of J.E. and M.F.
Finally, defendant states that there was no evidence to suggest or support the allegation that he struck, threatened, or assaulted the victim during their brief relationship. However, Corporal Re-mondet testified that, when he arrived on the scene, he observed that the victim appeared to have been severely beaten, that her eyes were swollen shut, and that blood was dripping down her face. Corporal Nolan testified that the victim had two swollen eyes and a wound in her forehead. Mr. Joseph, formerly Sergeant Joseph, testified that he observed that the victim’s 113face was badly swollen, that he had seen the victim previously, and that the swelling on her face was more than what would have been caused by a bullet. Although no witness testified that he or she observed defendant physically abuse Ms. Morris, it is reasonable to infer that defendant beat Ms. Morris in light of their tumultuous relationship, their argument prior to the shooting, and the fact that Ms. Morris was alone in the room with defendant at the time of the shooting.
Based on the foregoing, we find that the evidence was legally sufficient to convict defendant of the second degree murder of Ms. Morris and this assignment of error lacks merit.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent in this case.
In accordance with the above, we affirm the defendant’s conviction of second degree murder.

AFFIRMED.

. Because the witnesses were minors, their initials will be used to protect their identity.