GRAVOIS, J.
Defendant, Shaun Barnett, was convicted by a jury of the first degree murder of Dawn Scott, the first degree murder of Raynell Kimbrough, and of possession of a firearm by a convicted felon. On appeal, he argues multiple assignments of error. After thorough review, we find no reversible error and affirm defendant's convictions and sentences.
PROCEDURAL HISTORY
On August 25, 2016, a Jefferson Parish Grand Jury indicted defendant, Shaun Barnett, with the second degree murder of Dawn Scott in violation of La. R.S. 14:30.1 (count one), the second degree murder of Raynell Kimbrough in violation of La. R.S. 14:30.1 (count two), and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count three). Defendant was arraigned on August 26, 2016 and pled not guilty.
On September 7, 2017, a Jefferson Parish Grand Jury returned a superseding indictment amending defendant's charges from the second degree murder of Dawn Scott and the second degree murder of Raynell Kimbrough to the first degree murder of Dawn Scott in violation of La. R.S. 14:30 (count one), the first degree *214 murder of Raynell Kimbrough in violation of La. R.S. 14:30 (count two), and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count three).[1] On September 8, 2017, defendant was arraigned and pled not guilty.
On November 6, 2017, the State filed a Notice of Intent to Use Other Acts Evidence Pursuant to La. C.E. art. 404(B). On December 19, 2017, after a hearing, the trial judge granted the State's Notice of Intent to Use Other Acts Evidence Pursuant to La. C.E. art. 404(B) and ruled that the other acts evidence was admissible. Defendant sought writs, which this Court granted. This Court found that the other acts evidence was not admissible. State v. Barnett , 18-K-22 (La. App. 5 Cir. 1/19/18) (unpublished writ disposition). The State filed a writ with the Louisiana Supreme Court; the Supreme Court granted the writ and reinstated the ruling of the district court. State v. Barnett , 18-0121 (La. 1/21/18), 233 So.3d 605.
On January 22, 2018, the defense made an oral motion for competency that the trial judge initially granted, but then denied. Defendant thereafter informed the trial judge that he wanted to represent himself. On that same date, the State amended the indictment in connection with a predicate offense in count three to correct a typographical error regarding the statutory citation and the name of the offense. Also, the trial judge ordered the State to remove two of the predicate convictions from count three.
From January 22-26, 2018, the case was tried before a twelve-person jury that found defendant guilty as charged on all counts. On February 8, 2018, defendant filed a motion for a new trial that was denied on that same date. Afterwards, on that same date, the trial judge sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on count one; life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on count two; and imprisonment at hard labor for ten years without the benefit of probation or suspension of sentence on count three, with all of the sentences to run concurrently with each another. On February 19, 2018, defendant filed a timely motion for an appeal that was granted on February 21, 2018.
FACTS
On April 4, 2016, at 6:45 a.m., Erica Russell heard a knock at the door of her residence at 2140 Idaho Avenue, Apartment B, in Kenner, Louisiana. When she opened the door, D.S.,[2] the ten-year-old son of her neighbor, Dawn Scott, told her that his mother did not want to wake up, that he did not know where his father was, and that "blood is everywhere." Ms. Russell testified that she went to Ms. Scott's nearby residence at 2144 Idaho Avenue, Apartment D, and entered the apartment through the back door which was already open. She went upstairs to Ms. Scott's bedroom, after which she saw Ms. Scott lying in bed, a baby lying on the side of Ms. Scott, Raynell Kimbrough, Ms. Scott's boyfriend, lying between the bed and the dresser, and blood. Ms. Russell called 9-1-1 and reported the incident.
*215 Officer Kenneth Boudoin of the Kenner Police Department responded to the call at 2144 Idaho Avenue at "about 6:52, 53" a.m., which was within minutes of the call coming out. He testified that when he arrived, a female told him that she thought Ms. Scott and Mr. Kimbrough were dead. Officer Boudoin entered the residence and went upstairs, after which he found a deceased male and female and an infant who was breathing. Officer Boudoin spoke to Keoka Jack, a neighbor, who told him that she heard "some boom sound" coming from that apartment. She stated that when she went to check to see where the sounds came from, she saw a champagne-colored vehicle pull out of the driveway.
Detective Mike Jackson of the Kenner Police Department spoke to Arnell Kimbrough, Mr. Kimbrough's sister, who told him that the night before the homicides, Mr. Kimbrough and Shaun Barnett, defendant, were together at a daiquiri shop shooting pool.[3] Detective Jackson testified that he learned that defendant's address was 329 Pat Drive in Avondale and that a gold or champagne colored 2003 Ford Taurus with license plate ZNU817 was registered to defendant. On his way to 329 Pat Drive, Detective Jackson noticed a daiquiri shop in the neighborhood close to that address.
Sergeant Edward Rohde of the Kenner Police Department responded to the call at 2144 Idaho Avenue, Apartment D, and had a supervisory role over the crime scene. Sergeant Rohde testified that the crime scene was dusted for fingerprints and items were swabbed for DNA analysis. He stated that no weapons were on the scene, no casings were recovered, no prints came back to defendant, and some prints came back to Mr. Kimbrough. A bag of marijuana was found on the dresser and there was money in a drawer.[4]
Detective Harold Pendergast of the Kenner Police Department was the lead investigator in the homicides. He arrived at the scene at 7:01 a.m. He testified that they interviewed witnesses, collected evidence, retrieved traffic camera information regarding defendant's license plate, obtained defendant's cell phone records,[5] and obtained surveillance camera footage from near the crime scene,[6] near defendant's residence,[7] and at a nearby daiquiri shop.[8]
*216 Detective Pendergast stated that they ultimately obtained and executed search warrants for defendant's residence and vehicle.[9]
D.S., age twelve at the time of trial, testified that he lived with his mother, Ms. Scott, and her boyfriend, Mr. Kimbrough. He explained that there were two bedrooms upstairs and that he and his brother slept in one of them and that Ms. Scott and Mr. Kimbrough slept in the other one. He slept with his door open because his mother did not like it when the door was closed, and when he was in bed, he could look out the open door and see the stairs. D.S. stated that Mr. Kimbrough had guns in the apartment.
D.S. testified that on the night of the incident, he went upstairs to his room and went to sleep. He was awakened when he heard his mother and Mr. Kimbrough arguing that Mr. Kimbrough and someone else downstairs were making too much noise. After the argument was finished, D.S. went downstairs for something to drink, and when he did so, he saw someone with dreadlocks going out the back door. Although D.S. had never seen that person before, he heard Mr. Kimbrough call that person "Shaun." He then went to his room and went back to sleep.
D.S. later heard gunshots during the night and woke up. Thinking the gunshots came from outside, he walked over to the window. D.S. stated that he then heard the gunshots again and saw "little flashing lights" in his mother's room. D.S. hurried up and lay down, after which he saw somebody in black clothes come out of his mother's room and run down the stairs. He then went back to sleep. He stated that the person running down the stairs after the shooting was the same person who walked out the back door and the same person who Mr. Kimbrough called "Shaun."
D.S. explained that the next morning, he woke up and realized his mother had not awakened him. He went into her room and saw Mr. Kimbrough's body on the floor and some blood. He did not see his mother. D.S. went downstairs and saw that the back door was wide open. He recalled seeing one of Mr. Kimbrough's guns the night before; however, when he went to bring his young brother to use the restroom, the gun was not there anymore, and the bullets on top of it were gone. D.S. then went out the back door, knocked on the neighbor's door, and told her that his mother and Mr. Kimbrough were lying down upstairs and that he saw blood. D.S. said that the woman went and checked, *217 then came back downstairs, called the police, and told him his parents were dead.[10]
Frank Macaluso testified that in April of 2016, he was living in Kenner and that he would leave for work at 5:30 a.m. every morning. In doing so, he would drive to Circle K at the corner of Williams and Veterans to get some coffee. He stated that when he traveled down 22nd Street to get to Williams, he would pass by the apartment complex at 2144 Idaho. Mr. Macaluso testified that on April 4, 2016, he left his house at 5:30 a.m. As he slowly approached the apartment complex in his vehicle, he noticed a "black guy" standing between two vehicles wearing a camouflage jacket[11] and something white on his head. He stated that he and the "guy" "kind of startled each other" and "made eye contact." Mr. Macaluso explained that as he passed the complex, he noticed a gold Ford Taurus parked "funny up towards the front door." Afterwards, Mr. Macaluso went to work. While there, his daughters called and told him that some people had gotten shot near the Winn-Dixie, which he explained was near the apartment complex. Mr. Macaluso was unsure if what he saw meant anything, so he called the police. Later, the police showed him a photographic lineup and he positively identified image number 4 as the individual in the camouflage jacket he saw outside of 2144 Idaho on April 4, 2016. Detective Pendergast testified that Mr. Macaluso was able to identify defendant in that photographic lineup.
Keoka Jack testified that on April 4, 2016, she was living at 2144 Idaho Avenue, Apartment C, with her four-year-old son and her boyfriend, Carey Jones, next door to Ms. Scott and Mr. Kimbrough. On that date, at "6:00 something," she heard two noises, like "boom, boom" coming from upstairs in her apartment.[12] She stated that her master bedroom shares a wall with Ms. Scott and Mr. Kimbrough's master bedroom. Ms. Jack went upstairs, grabbed her son, and heard a second set of "booms" from the same room. She placed her son on the downstairs sofa and approximately five minutes later, she heard a car "crank." Ms. Jack opened her front door and saw an older model champagne-colored Taurus backing out from the front of Ms. Scott and Mr. Kimbrough's front door.
Carey Jones testified that in April of 2016, he was living at 2144 Idaho Avenue, Apartment C, with his fiancée, Keoka Jack, and his son. He explained that in the early morning hours of April 4, 2016, he was awake at 2:00 a.m. smoking a cigarette outside his door when he observed Mr. Kimbrough and a "black guy" pulling up in a gold "Taurus or something like that." Mr. Jones stated that Mr. Kimbrough was in the passenger seat and the "other guy" was driving. Mr. Kimbrough and the "other guy" exited the vehicle and went inside Mr. Kimbrough's residence. Mr. Jones explained that Mr. Kimbrough stopped to talk to him for a minute before going inside. He testified that at approximately *218 2:30 a.m., while he was watching television, he heard Mr. Kimbrough and his girlfriend "fussing." Mr. Jones guessed that Ms. Scott was upstairs telling Mr. Kimbrough to stop making so much noise. Afterwards, Mr. Jones dozed off. He left for work "about five after, ten after 6:00", and Ms. Jack later called to tell him about the shooting.
Jessica Marchan testified that in April of 2016, she lived at 2144 Idaho Avenue, Apartment A, with her husband, her four children, and her brother, Gabriel Gonzales. Ms. Marchan recalled seeing a black male with dreads wearing a "hat type thing" who visited and spent the nights at the apartment of Mr. Kimbrough and Ms. Scott. She also recalled that individual drove a gold Ford Taurus. Ms. Marchan identified State's Exhibit 48 as a photograph showing Mr. Kimbrough and also the person who was always at his house driving that car.
Gabriel Gonzales testified that in April of 2016, he was living in the 2400 block of Idaho in an apartment complex with his sister, Jessica Perez, her husband, and their four children. He explained that he took care of his sister's children during the day and that he worked the overnight shift at Rouses in Metairie. Mr. Gonzales initially testified that on April 4, 2016, he got home at approximately 6:00 or 6:10 a.m., but when confronted with his grand jury testimony, he admitted that he probably got home at 6:45 a.m. He stated that he went inside, after which he heard noises that sounded like Winn-Dixie employees unloading and taking out their pallets. However, Mr. Gonzales explained that it could not have been that because he knew that Winn-Dixie did not take their pallets out then. He then heard crying in the back side of the apartment complex. When he went to find out what had happened, he learned that the individuals in Apartment D had been shot. Mr. Gonzales testified that while living at the complex, he saw visitors at the victims' apartment. He recalled seeing a male visitor with "dreads" on more than one occasion. The police showed him a photographic lineup, and he positively identified defendant as that person. He also positively identified defendant in court.
Ellen Scott testified that one of the victims, Dawn Scott, was her daughter. After the murders, she went to Ms. Scott's apartment to remove her belongings, but she never recovered Ms. Scott's purse.
Officer Matthew Glapion, Sr. testified that he was a Kenner Police Department officer assigned to the U.S. Marshals fugitive task force. On April 4, 2016, Officer Glapion went to 329 Pat Drive in Avondale to locate defendant, but left when he did not see a gold Taurus there. When he returned shortly thereafter, he saw a gold Taurus backed into the driveway. Officer Glapion testified that defendant, his mother, and his brother were there.
Sergeant Jeffrey Adams of the Kenner Police Department testified that on April 4, 2016, he responded to the scene at 2144 Idaho Avenue, Apartment D. He supervised and participated in the execution of the search warrant on the house and the vehicle at 329 Pat Drive. They seized two black and gray jackets from the trunk of the vehicle, a cell phone located in the glove compartment, the social security card of Ms. Scott's younger child, a healthcare card in Ms. Scott's name, and a piece of paper with possible PIN numbers or passcodes on it with Ms. Scott's name on it from the back seat of the vehicle. They also seized a camouflage jacket from the living room, two socks and a flashlight from the left pocket of that jacket, defendant's ID from defendant's mother's room from between the mattress and the bedspread, the keys to defendant's vehicle *219 from under a hat, and an envelope mailed to defendant found in his mother's room.
Sergeant Adams explained that the camouflage jacket was seized because video footage from a neighbor's house indicated that defendant arrived in his vehicle wearing a camouflage jacket and exited without that jacket. He testified that the crime scene on Idaho Avenue was broken into a couple of times after the murder. Therefore, they went back to search the house again during which they found an AK 47 cartridge and an AK 47 bullet. Sergeant Adams testified that on April 4, 2016, there was no forced entry on either door, but on April 17, there were signs of forced entry.[13] He recalled that there was a rumor that tax-return money should have been there.
Dr. Marianna Eserman, the Jefferson Parish deputy coroner, was qualified as an expert in the field of forensic pathology. She testified that she performed autopsies on the victims. As to Ms. Scott, Dr. Eserman testified that the cause of death was a gunshot wound to the head and that the manner of death was homicide. She further explained that Ms. Scott also sustained a gunshot wound to the left trunk and a graze gunshot wound to the left upper extremity. As to Mr. Kimbrough, Dr. Eserman testified that the cause of death was a gunshot wound to the head and that the manner of death was homicide. She further testified that Mr. Kimbrough also sustained gunshot wounds to the trunk. Dr. Eserman maintained that the weapon was at least two or three feet away from the wounds when it was fired. She noted that Mr. Kimbrough had a high alcohol level consistent with an individual drinking a lot of alcohol just prior to his death.
Pamela Williams-Cyprian, a drug analyst at the Jefferson Parish crime lab, was qualified as an expert in the field of the analysis and identification of controlled dangerous substances. She analyzed a clear plastic bag containing green "vegetative" material and a piece of paper containing a white powder-like substance. Ms. Williams-Cyprian testified that testing revealed that the green "vegetative" material was marijuana and that the white substance did not contain cocaine.
Lucy Camarena, a former JPSO DNA analyst, was accepted as an expert in the field of forensic DNA analysis. Ms. Camarena testified that she conducted DNA analysis on the camouflage, long sleeve shirt seized from defendant's residence. She found that the DNA profile obtained from the cuttings from the sleeve of the shirt (42T1) and from the lower back of the shirt (42T6) were consistent with the DNA profile obtained from the victim, Mr. Kimbrough. She also found that the probability of finding the same DNA profile if the DNA had come from a randomly selected person other than Mr. Kimbrough was one in greater than a hundred billion.
Detective Pendergast testified that he obtained information that there was some sort of romantic relationship between defendant and Ms. Scott, and therefore, he had requested a paternity test for R.S., the infant lying next to Ms. Scott when she was found. Ms. Camarena testified that Mr. Kimbrough could not be excluded as the biological father of R.S., and that Mr. Kimbrough was three million times more likely to be the father of R.S. than another randomly selected African-American male. She maintained that the relative probability *220 of paternity was 99.99 percent for Mr. Kimbrough and that defendant was excluded as the biological father of R.S.
Jene' Rauch testified that she worked for the JPSO crime lab as the supervisor of the firearm and tool-marks section. The trial court thereafter accepted her as an expert in the field of "Firearms and Tool Mark Examination." She testified that specimen 14A (a copper jacket from the upstairs bedroom), specimen 15 (a copper-jacketed projectile from the right breast of Ms. Scott), specimen 16A (a copper jacket from Ms. Scott's skull), and specimen 17A (a copper-jacketed projectile from Mr. Kimbrough's skull) were all fired from the same gun and were consistent with .38 caliber class ammunition. Ms. Rauch determined that the evidence was consistent with the use of a revolver.
JPSO Detective Joseph Mancuso testified that he worked with traffic cameras and the license plate recognition system and that he did so in April of 2016. He explained that license plate cameras were set up throughout Jefferson Parish in multiple locations and that they searched for defendant's license plate number ZNU817 for April 4, 2016, the date of the incident. The evidence reflected that defendant's residence was on Pat Drive in Avondale on the West Bank of Jefferson Parish and that the homicides were committed in Kenner on the East Bank of Jefferson Parish. Detective Mancuso indicated that the evidence showed that defendant's vehicle was seen going back and forth in the area between his residence and the crime scene several times on April 4, 2016. Significantly, he explained that the evidence showed that defendant's vehicle was seen at Huey P. Long and Clearview west at 6:42 a.m., heading back toward the area of his residence shortly after the homicides were committed.[14]
Leland Dwight, an investigative specialist for the Louisiana State Police, testified that he plotted defendant's cell phone calls on maps using tower locations. He was also provided with license plate readings. Based on that information, he produced a report regarding his analysis of them. Mr. Dwight indicated that the location of the cell phone calls and the location of defendant's vehicle on April 3 and 4, 2016 matched closely. He explained that this showed that defendant's cell phone and vehicle went back and forth in the area between his residence and the crime scene on those dates.[15]
*221 Jeremy Smith testified that he was incarcerated within the Department of Corrections and serving a two-year sentence for drug possession. Mr. Smith explained that on August 7, 2016, he was arrested and held in the Jefferson Parish Correctional Center. He said that from August 9, 2016 until November 3 or 4, 2016, he and defendant were bunkmates. He stated that he had never met defendant, heard his name, or saw his face before he met defendant in prison. Mr. Smith indicated that defendant was not friendly or talkative at first, but after a couple of weeks, defendant started talking to him. Mr. Smith testified that defendant told him that the tattoo on his arm, "Jasmine," was the name of his ex-girlfriend whom was with him seven or eight years when he committed a murder, that he and his ex-girlfriend's father had problems, and that defendant had killed "Jasmine" because she witnessed him commit the other crime.
Mr. Smith also testified that defendant told him about his current charges, namely, that defendant and his friend "Pluck" (Mr. Kimbrough) used to ride together to work and that they went to a daiquiri shop and got into an argument. Mr. Smith stated that defendant told him that he and Mr. Kimbrough went back to Mr. Kimbrough's home and that later that night, there was another argument in the living room between him and Mr. Kimbrough. Mr. Smith explained that defendant said that Mr. Kimbrough's wife came downstairs and told defendant to leave, but they ended up upstairs where there was a fight between defendant and Mr. Kimbrough, after which defendant shot Mr. Kimbrough and Mr. Kimbrough's wife. Defendant told him that afterwards, he left the scene, threw the gun in a river, went to his mother's house, and then later left. He testified that defendant told him that he thought Ms. Scott's baby was his as he was "sleeping with" Mr. Kimbrough's wife. Mr. Smith recalled that defendant mentioned some drugs Mr. Kimbrough had. He also testified that defendant told him that the police were trying to prove he committed the crime by putting blood on a camouflage jacket.
Mr. Smith testified that he spoke to his fiancée about his talks with defendant and they decided it would be best to talk to the police. Thus, his fiancée made contact with law enforcement. He identified an advisory of rights form he reviewed before he spoke to Detective Pendergast. Mr. Smith explained that the detective did not offer him anything for his statement and that he came forward because it was the right thing to do. He felt like defendant was a "monster" who needed to "pay for what he did." Mr. Smith testified that the State subsequently offered him a plea agreement for his current charges, i.e. , possession of "meth," marijuana, and clonazepam. He insisted that he never lived on the Westbank, Avondale, Woodmere, Harvey, or Kenner. Mr. Smith stated that the State told him several times to be honest and to say what he remembered to the best of his ability.
*222 Dennis Thornton, a former JPSO captain, testified that in 2007, when he was commander of the homicide division, Perry Ingram was murdered on November 18, 2007, at approximately 1:40 a.m., in the 3700 block of Longleaf in the Woodmere subdivision in Harvey. He testified that another dispatch came out at 6:16 a.m. regarding the murder of Jasmine McGinnis that also occurred that morning at 1524 Haydel Drive in Marrero. Captain Thornton testified that at the time of the second murder, Ms. McGinnis was wearing a shirt with a picture of her and defendant on it, her name, the name of "Shaun," and the words, "get money." He explained that defendant was a suspect in Mr. Ingram's murder and that defendant came in willingly to give a statement. The tape was played for the jury.
Captain Thornton testified that defendant admitted that his picture and name were on Ms. McGinnis' shirt and that he had been in a relationship with Ms. McGinnis. He noted that during the statement, the detective taking the statement mentioned how the Ingram and McGinnis homicides were connected. Captain Thornton testified that this was by ballistic material that was found on both scenes. Captain Thornton explained that there was not enough evidence to charge anyone at that time. He retired in March of 2015 but was re-hired to work in the intelligence division in cold-case homicides. Captain Thornton testified that in June of 2009, Ronald Bowman wanted to provide a statement regarding the Ingram case. According to Captain Thornton, Mr. Bowman told him that there were males and females on the scene of the Ingram homicide after shots were fired and that one of them was Ms. McGinnis. Mr. Bowman also told him that the motive for the killing stemmed from a burglary that occurred prior to the homicide involving a policeman's house where some weapons were stolen.
Captain Thornton testified that deputies determined that there was a burglary of firearms from JPSO Deputy James Jefferson at 2307 Alex Kornman in Woodmere. He explained that the deputy reported a break-in while he was gone from his house from November 20 to 25, 2007. Captain Thornton stated that did not make sense to him since Mr. Ingram was murdered before that break-in. In his statement, Mr. Bowman also stated that he ran outside right after the murder and saw two individuals with guns and neither was defendant.
Chief Timothy Scanlan, who was accepted as an expert in the fields of crime scene reconstruction, blood stain pattern analysis, and firearm and tool-mark examination, testified that he was asked to compare ballistic evidence from two homicides that occurred in Jefferson Parish in 2007. He maintained that his testing indicated that the same .380 automatic pistol was fired on both crime scenes. He further maintained that two weapons were used in each of the 2007 homicides.
Concerning the instant matter, Chief Scanlan maintained that his blood stain analysis indicated that Ms. Scott was killed in bed in the position where she was found. He stated that, most likely, her first wound was the head wound. Chief Scanlan testified that blood stain patterns struck the wall which was consistent with blood spurting from Mr. Kimbrough's wounds. He further testified that the "drip trail" was consistent with Mr. Kimbrough coming to rest in a seated position on the way down to the ground. He maintained that the evidence was consistent with Mr. Kimbrough being shot in the eye while standing at or near the location where his body was found. Chief Scanlan testified that projectiles on the scene were matched to *223 projectiles recovered from the bodies. He also stated that Mr. Kimbrough's blood was found on the camouflage jacket and that the blood would have been wet in order to make that stain on the jacket.
The State and the defense stipulated that defendant had prior felony convictions in case number 10-1359, Division "O", on March 15, 2012, for possession with intent to distribute marijuana in violation of La. R.S. 40:966(A) ; attempted aggravated assault with a firearm in violation of La. R.S. 14(27) 37.4; aggravated criminal damage to property in violation of La. R.S. 14:55 ; and possession of cocaine in violation of La. R.S. 40:967. They stipulated that defendant was the individual found guilty of those charges.
Defendant testified that he had been falsely accused in the instant case because of his past history as a convicted felon. He stated that because he was not a good speaker and had difficulty expressing himself, he wrote letters explaining his character in order for the jury to understand him. In those letters, defendant asked not to be judged by his past history and said that he was not a "hardcore criminal." Defendant testified that he was not involved in the murders of Mr. Ingram or Ms. McGinnis. He said that he heard that Ms. McGinnis had commented that she witnessed a murder and that is why she got killed. Defendant testified that he was at a home when Ms. McGinnis was murdered. He also denied killing Mr. Kimbrough and Ms. Scott. Defendant acknowledged that he shared a bunk with Mr. Smith and believed that Mr. Smith testified the way he did for a plea deal.
Defendant identified himself in the video as wearing the camouflage jacket - the same one introduced into evidence. He also identified himself in the video with Mr. Kimbrough at the daiquiri shop. Defendant claimed that Marlin Fisher was driving his car that night. He denied that there was an argument that night. Defendant testified that he, Mr. Fisher, and Mr. Kimbrough went to Mr. Kimbrough's residence that night. He stated that he drove Mr. Kimbrough home, but that he was not there at the time Mr. Kimbrough was murdered. Defendant denied being in his car at 6:42 a.m. when it was going back to the Westbank. He admitted that he had convictions for possession of cocaine and aggravated assault in 2013 and for possession of marijuana.
ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, defendant argues that the trial court erred in granting the State's La. C.E. art. 404(B) motions and admitting evidence of other crimes. He contends that the State was allowed to bring in evidence through his cellmate, Jeremy Smith, who claimed that defendant confessed to murdering two people in 2007. He argues that the State used Mr. Smith's testimony to portray him as a killer and the result was highly prejudicial. Defendant asserts that Mr. Smith used this claim prior to his own trial to get a better deal from the State as evidenced by Mr. Smith's two-year plea deal. He also asserts that the other crimes evidence was used as a ruse to bolster the State's case and that it prejudiced him, noting that there was no similarity between the crimes and no claim of a pattern. Defendant maintains that the error in admitting the other crimes evidence was not harmless because the verdict was solely attributable to the error.
The State responds that defendant's confession to two other, unrelated murders to the jailhouse informant was properly admitted under La. C.E. art. 404(B) because such confession was not used as improper "propensity evidence," but rather *224 was used to corroborate the (otherwise inherently suspect) testimony of the jailhouse informant given that the jailhouse informant could not have reasonably known of the two other, unrelated murders unless he had heard of them from defendant himself.
On November 6, 2017, the State filed a notice of intent to use other bad acts evidence pursuant to La. C.E. art. 404(B).[16] The State said that it intended to use the following other bad acts evidence at trial: 1) defendant confessed to his cellmate, Jeremy Smith, that he murdered Ms. Scott and Mr. Kimbrough; 2) defendant told Mr. Smith that he intended to kill "Dee", a girl he was dating; 3) defendant confessed to Mr. Smith that he murdered Jasmine, his ex-girlfriend; 4) a police investigation showed that a victim named Jasmine McGinnis was murdered on November 18, 2007; 5) a police investigation showed that Perry Ingram was murdered the same night as Mr. McGinnis within a few blocks of Ms. McGinnis' home; and 6) ballistic evidence from the Ingram scene matched ballistic evidence at the McGinnis scene.
On December 19, 2017, at the hearing on the motion, defense counsel and the State made their respective arguments. After the trial judge indicated that he had read the State's notice of intent and the defense's response, he granted the State's motion. Defendant filed a writ application with this Court challenging the trial court's ruling. This Court granted the writ, stating in pertinent part:
Here, on the showing made, we cannot say that the State proved by a preponderance of the evidence that defendant committed the 2007 homicides as there is nothing to connect defendant to the 2007 shootings except the statement of the jailhouse informant. Accordingly, we grant this writ application and reverse the trial court's ruling that the other bad acts evidence related to the 2007 shootings will be admissible at trial and we remand for further proceedings. See State v. Chatman , 2017-1698 (La. 10/17/17), 227 So.3d 802, 803.
State v. Barnett , 18-K-22 (La. App. 5 Cir. 1/19/18) (unpublished writ disposition).
The State thereafter filed a writ application with the Louisiana Supreme Court challenging this Court's ruling. The Supreme Court granted the writ and reinstated the ruling of the district court. State v. Barnett , 18-0121 (La. 1/21/18), 233 So.3d 605. At trial, evidence of these other bad acts was admitted.
La. C.E. art. 404(B)(1) provides for the admission of other crimes evidence as follows:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
*225 In order for evidence of other crimes, wrongs, or acts to be admitted, certain requirements must be met. First, pursuant to State v. Prieur , 277 So.2d 126 (La. 1973), the State must provide written notice to the defendant of the acts it intends to prove, along with the exception to the exclusionary rule upon which it relies. State v. Le , 13-314 (La. App. 5 Cir. 12/12/13), 131 So.3d 306, 317. Additionally, one of the factors listed in Article 404(B) must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible. State v. Jackson , 625 So.2d 146, 149 (La. 1993) ; State v. Marshall , 13-233 (La. App. 5 Cir. 10/30/13), 128 So.3d 1156, 1160. Further, the State must prove that the defendant committed the other acts by a preponderance of the evidence. Huddleston v. United States , 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988) ; State v. Hernandez , 98-448 (La. App. 5 Cir. 5/19/99), 735 So.2d 888, 898-99, writ denied , 99-1688 (La. 11/12/99), 750 So.2d 194. Finally, the probative value of the extraneous evidence must outweigh its prejudicial effect. State v. Page , 08-531 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 451, writ denied , 09-2684 (La. 6/4/10), 38 So.3d 299.
The burden is on the defendant to show that he was prejudiced by the trial court's admission of evidence of other crimes, wrongs, or acts. Marshall , 128 So.3d at 1160. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be disturbed. Le , 131 So.3d at 317.
Even assuming arguendo that evidence of defendant's other bad acts constituted inadmissible other crimes evidence, any such error is subject to a harmless error analysis. See State v. Williams , 09-48 (La. App. 5 Cir. 10/27/09), 28 So.3d 357, 365, writ denied , 09-2565 (La. 5/7/10), 34 So.3d 860. The test for determining if an error was harmless is whether the verdict actually rendered in the case was surely unattributable to the error. Id.
In the instant case, this Court granted defendant's writ application ruling that the other bad acts evidence was inadmissible; however, the Louisiana Supreme Court reversed this Court's ruling and reinstated the trial court's ruling allowing the State to introduce that evidence. As an intermediate appellate court, this Court is obliged to follow the precedent established by the Louisiana Supreme Court. See State v. Thomas , 10-220 (La. App. 5 Cir. 11/9/10), 54 So.3d 678, 686, writs denied , 10-2752 (La. 5/20/11), 63 So.3d 974 and 10-2758 (La. 4/25/11), 62 So.3d 89.
After a review of the full and complete record on appeal, which consists of the trial transcript as well as various motion hearing transcripts, we find that there is no reason to disturb the previous ruling on this issue. Defendant has failed to cite any new facts or additional jurisprudence indicating that the Louisiana Supreme Court's prior disposition on this issue was patently erroneous and produced an unjust result, nor does the full record reveal any new evidence indicating such.
The record shows that Mr. Smith testified that defendant told him that he killed his former girlfriend, Jasmine, because she could implicate him in another murder, and that he killed the victims in the instant case. Captain Thornton testified that an investigation revealed that Jasmine McGinnis, defendant's former girlfriend, was, in fact, murdered shortly after Perry Ingram was murdered and that the same weapon was used to kill both of them. We find that the other crimes evidence corroborated Mr. Smith's testimony and gave credibility to his other claim that defendant *226 admitted to him that he killed the victims in the instant case.
Nevertheless, we find that even if the trial court erred by admitting the other crimes evidence, any such error was harmless considering the overwhelming evidence of defendant's guilt. The evidence strongly indicated that defendant's camouflage jacket, which he had been wearing the night of the murders, had some of the victim's blood on it. In fact, defendant identified himself in the video as wearing the camouflage jacket, the same one introduced into evidence. The timeline of the route defendant's vehicle took on the night in question put defendant in relevant places at relevant times. The victims' neighbors testified that defendant and his vehicle were present near the apartment that night, including at the time of the murders. Additionally, some of Ms. Scott's belongings were found in defendant's vehicle. Ms. Scott's son testified that he saw someone with "dreads," whom Mr. Kimbrough called "Shaun", leave the apartment hours before the murder and run down the stairs after the murders.
In light of the foregoing, we find that the trial court did not err by admitting the other crimes evidence. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, defendant argues that the trial court erred when it granted the State's Motion in Limine precluding his right to present the defense that he passed a police polygraph test when questioned in 2007 as a suspect in the 2007 murders. He argues that it was inexplicable that a self-serving claim by a cellmate was allowed into evidence as more reliable than a police-issued polygraph. Defendant contends that the fact that he passed a police polygraph would have clarified for the jury why he was never charged though questioned. He asserts the trial court effectively hamstrung the defense's ability to contest the allegations of a random cellmate looking for a deal with the State with more reliable and timely evidence.
The State responds that the trial court did not err in excluding defendant's polygraph results given that Louisiana jurisprudence unequivocally deems polygraph evidence inadmissible at a criminal trial.
On January 19, 2018, the State filed a Motion in Limine asking the trial court to preclude the parties from questioning any witness regarding the polygraph examination that defendant participated in when he was interviewed as a potential suspect in two murders in 2007. The State argued that in Louisiana, polygraph examination results were inadmissible in a criminal trial.
On January 22, 2018, at the hearing on the motion, the State argued that the results of defendant's polygraph examination should not be admitted at trial. Defense counsel responded that the polygraph evidence was admissible as rebuttal evidence to the "State's 404(B)." After hearing arguments of counsel, the trial judge granted the State's Motion in Limine. Defense counsel noted his objection.[17]
A criminal defendant has the constitutional right to present a defense. United States Const. amends. 6 and 14 ; La. Const. art. 1, § 16 ; Crane v. Kentucky , 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ;
*227 State v. Van Winkle , 94-0947 (La. 6/30/95), 658 So.2d 198, 201. A defendant should therefore be allowed to present evidence on any relevant matter. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, 1037, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). This right is not without limitation, and unreliable evidence may be barred from criminal trials. Id.
The Louisiana Supreme Court has long adhered to the view that lie detector or polygraph test results are inadmissible for any purpose at the trial of guilt or innocence in criminal cases. State v. Cowart , 01-1178 (La. App. 5 Cir. 3/26/02), 815 So.2d 275, 286, writ denied , 02-1457 (La. 5/9/03), 843 So.2d 387. Consistent with this view, the Supreme Court has "made it clear" that the rule excluding polygraph evidence "also operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony." State v. Hocum , 456 So.2d 602, 604 (La. 1984) ; State v. Tonubbee , 420 So.2d 126, 132 (La. 1982), cert. denied , 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983) ; State v. Davis , 407 So.2d 702, 706 (La. 1981). Additionally, the Louisiana Supreme Court has held that polygraph information and test results are inadmissible " 'either as substantive evidence or as relating to the credibility of a party or witness.' " State v. Humphrey , 445 So.2d 1155, 1158 (La. 1984) (quoting Tonubbee , supra , at 132 ). The principle reasons such evidence is inadmissible are its lack of probative value, insufficient scientific reliability, and its potential for an unduly prejudicial effect on lay jurors. State v. Robertson , 97-0177 (La. 3/4/98), 712 So.2d 8, 35, cert. denied , 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998).
The Louisiana Supreme Court has made it clear that polygraph test results are inadmissible in criminal cases. As such, we find that the trial court did not err by granting the State's Motion in Limine and precluding such evidence. Defendant contends that the polygraph test results would have shown the jury why he was not charged with the 2007 murders. However, other evidence was presented at trial that showed why defendant was not charged with the 2007 murders. Captain Thornton testified that there was not enough evidence to charge anyone with those murders at that time. Also, although the ballistic evidence linked the two 2007 murders, Captain Thornton testified that in Mr. Bowman's statement, he said that he ran outside right after the murder of Perry Ingram and saw two individuals with guns and neither was defendant.
Thus, we find that the trial court did not err by granting the State's Motion in Limine and prohibiting evidence regarding the polygraph test results from 2007. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER THREE PRO SE ASSIGNMENT OF ERROR NUMBER ONE [18]
In these assignments of error, defendant argues that the trial court erred in not having his mental competency evaluated when it was requested by defense counsel and based on reasonable grounds. He maintains that the trial court initially agreed that there were reasonable grounds and ordered a hearing. However, defendant states that it was only after the trial court learned that the doctors were not available until two days later that the order was rescinded and the grounds considered no longer reasonable. Defendant asserts that it is clear from the transcript that the trial court's primary focus was to *228 move the case off his docket. He maintains that while judicial expediency is important, it should not be obtained at the expense of proper procedure and ensuring due process under the law.
The State responds that the trial court did not err in declining to order a mental examination of defendant because defense counsel presented nothing other than unsubstantiated allegations regarding the necessity of a mental examination.
On January 22, 2018, defense counsel said that he was requesting that the trial court order an evaluation of defendant's mental competency and competency to stand trial. He stated that he was raising this issue based on interactions with defendant "that occurred in the past based on Mr. Barnett's actions during trial now where he's indicated he wishes us to no longer represent him." Defense counsel asserted that he had also learned that morning from his investigator that defendant had a history of mental illness, schizophrenia, and psychotic symptoms. He said he also learned that defendant had been committed to River Oaks for a period of time and had been on medications. Defense counsel maintained that all of those issues gave rise to grounds for raising competency at that time. The State had no response.
The trial judge stated that in light of the discussion that they had in chambers, he had contacted the doctors who were going to call him back. He stated that since the issue had been raised, he could not ignore it. The trial judge asserted that he would have defendant evaluated, but that he was not stopping the trial unless the defense was going to take a writ. He stated that they would proceed forward unless this Court or the Louisiana Supreme Court told him not to. The trial judge also stated that the doctors would be in touch with him based on defense counsel's oral motion, but he asked the defense to follow up with a written motion.[19] He hoped that the doctors would evaluate defendant that day.
Afterwards, the trial judge was informed that the doctors were not available until Wednesday because they were in a murder trial. He said that he would call the doctors back shortly and that they were proceeding with jury selection. The trial judge opined that defendant had the right to represent himself but that they were proceeding with the trial, and defendant had counsel there who were experienced and knowledgeable. The trial judge then recessed. When he went back on the record, the trial judge said that he had taken a break to review issues relative to defense counsel raising the issue of defendant's competence to proceed.
The trial judge recounted that he reviewed case law and La. C.Cr.P. art. 643, which provided that the court shall order a mental examination of a defendant when it had reasonable grounds to doubt his mental capacity to proceed. The trial judge stated that he had reviewed the record, that the matter had been pending for more than a year, and that he had found no motions in the record regarding defendant's competency or a request for a competency examination. He stated that it was curious that defendant's mental competency was only brought to his attention during jury selection when he had stated that there would be no continuances. As such, the trial judge said that after reading La. C.Cr.P. art. 643 and the case law, he was going to revoke or withdraw his previous order to have defendant examined as he found that there were no reasonable *229 grounds to doubt defendant's capacity to proceed. Therefore, the trial judge decided that he was going to proceed with the trial. He thereafter noted defense counsel's objection. Defense counsel asked for a brief recess to investigate the issues regarding competency, and the trial judge said that he was going to proceed with jury selection since he had a jury across the hall. The trial judge stated that they would have an opportunity to present the matters to the Court again in the morning.
On January 23, 2018, the transcript reflects that the prosecutor stated that there had been a request for a competency "matter" the day before and that there had been a question about there possibly being a commitment with the Coroner's Office. The prosecutor explained that he had checked with the Coroner's Office, and they had no records of any civil commitments or anything for defendant. Defense counsel replied that he had raised the issue of competency the day before based on "sound information" and that they were still trying to obtain that information. The trial judge responded that he had nothing before him that said this information was sound, and therefore, he was going to maintain his previous ruling.
According to La. C.Cr.P. art. 641, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." A defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. La. C.Cr.P. art. 642. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed. Id.
The trial judge is required to order a mental examination of the defendant only when he has a reasonable ground to doubt the defendant's mental capacity to proceed. La. C.Cr.P. art. 643 ; State v. Pugh , 02-171 (La. App. 5 Cir. 10/16/02), 831 So.2d 341, 349. Reasonable grounds to doubt the defendant's mental capacity to proceed refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant cannot understand the proceedings, appreciate the significance of the proceedings, or rationally aid his attorney in his defense. State v. Williams , 02-1016 (La. App. 5 Cir. 2/25/03), 841 So.2d 936, 942, writ denied , 03-2205 (La. 8/20/04), 882 So.2d 571. The ordering of a sanity commission rests in the sound discretion of the trial court. State v. Fish , 99-1280 (La. App. 5 Cir. 4/12/00), 759 So.2d 937, 939. The trial court's denial of a motion for appointment of a sanity commission will be reversed only for abuse of discretion. State v.Pollard , 12-346 (La. App. 5 Cir. 12/18/12), 106 So.3d 1194, 1199, writ denied , 13-0140 (La. 6/21/13), 118 So.3d 408.
In the instant case, we find that the record does not reflect that there were reasonable grounds to doubt defendant's mental capacity to proceed under La. C.Cr.P. art. 641. There is nothing in the record that would have alerted the court that defendant did not understand the proceedings, appreciate the significance of the proceedings, or rationally aid his attorneys in his defense. See Williams , supra. Although the trial judge initially ordered a mental examination, he may have thought that he had to do so as evidenced by his statement that since the issue had been raised, he could not ignore it. Nevertheless, after the trial judge took a break and reviewed the case law and *230 La. C.Cr.P. art. 643, he realized that there were no reasonable grounds to doubt defendant's capacity to proceed. During the hearing, the trial court noted that defendant was upset because his attorneys had not come to see him the night before trial and did not provide certain discovery to him. Defendant further stated his counsel could not pay for a scientific expert to test blood found on the evidence. Defendant indicated that he wanted to represent himself based on those concerns. Defense counsel told the trial judge that they were asking for a competency evaluation because of defendant's desire to represent himself. We find that the issues that defendant was concerned about do not reflect that defendant did not have the mental capacity to proceed. Accordingly, we find that the trial court did not abuse its discretion by declining to order a competency examination. This assignment of error is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER TWO
In this assignment of error, defendant argues in his pro se brief that he informed the trial court that he wanted to fire his court-appointed attorneys because they did not come and visit him in jail the night before trial so he could review the discovery material with them in preparation for the trial. He states that he asked the trial court to allow him to represent himself and that the trial court conducted a Faretta[20] hearing and granted his request. Defendant asserts that when trial resumed the following day, the two court-appointed attorneys continued to represent him and the trial court made no inquiry as to whether he waived his right to represent himself. He further contends that the court-appointed attorneys simply usurped his fundamental right to represent himself, and therefore, he must be accorded a new trial without any need to show prejudice.
The State responds that the trial court did not allow defendant's attorneys to "usurp" his right to represent himself, but rather to the contrary, the trial court properly allowed defendant to represent himself, and it was defendant himself who changed his mind.
The record reflects that on January 22, 2018, the trial court indicated that defendant was upset because his counsel did not go and see him the night before trial and that he had not received some discovery. The trial court said there was nothing it could do about that. Defendant replied that he wrote to his lawyers, that he wanted to be fully prepared, and that his counsel failed to prepare him for trial. The trial court asserted that what defendant and his counsel discussed was attorney/client privileged. The trial court stated that it was not "his job" to take care of the issues defendant raised and that if defendant did not want his counsel to represent him, he could fire them. Defendant replied that he would fire them because he did not want them to represent him. The trial court commented that they were going forward with the trial and that he had the right to represent himself. The trial court suggested that defendant take an hour and then let the court know what he had decided.
After the recess, defense counsel said that he was requesting that the trial court order an evaluation of defendant for mental competency and competency to stand trial. He stated that he was raising this issue based on interactions with defendant "that occurred in the past based on Mr. Barnett's actions during trial now where he's indicated he wishes us to no longer represent him." Defendant's counsel said that he believed they should conduct a *231 Faretta hearing. The trial judge responded that he had made it "abundantly clear" to defendant that it would be a "grave" mistake for him to represent himself; however, he noted that defendant had the right to do so. The trial judge also responded that if defendant wished to proceed, the court would conduct a Faretta hearing. Defendant voiced his concern regarding the main evidence against him, but the trial judge replied that his job was not to make a ruling regarding the evidence at that time. The trial judge stated that it would be a "huge" mistake for him to try to fire his counsel at that time. The trial judge noted that defendant's counsel were very experienced lawyers who had trial experience. The trial court said it assumed that defendant had no trial experience, and defendant indicated he had none at all.
The trial court suggested that defendant allow his counsel to continue representing him when they broke for the day, that his counsel would see him and discuss any issues they had regarding discovery or police reports or anything else. When the trial court asked defendant, "That's something you can discuss with them, okay?," defendant replied, "Right. Your Honor, I'm innocent. How would I - -." The trial court said he was not going to discuss defendant's guilt or innocence and that was the jury's function. Defendant said he wanted to state for the record that his counsel indicated that their department did not have the money to afford a blood specialist to determine how the blood was obtained on "this," that this was the main evidence against him, and that he did not have the funds to do that. The trial court said it did not get into those issues and that the issue was whether defendant wished to have his counsel continue to represent him. Defendant replied, "Not at all, sir."
When the trial court asked if he was going to represent himself, defendant responded, "I don't know what I'm doing." "That's what they're there for me to - -." Defendant added that he was ready to go through with the "process" and that he needed a fair trial and to be treated fairly. The trial court suggested that he keep his counsel on his case, after which he asked defendant if he had ever tried a case before. Defendant said he had not. Defendant thereafter indicated that he had a twelfth-grade education. The trial court asked him if he had experience with selecting a jury or anything of that nature, and defendant replied that he had not. The trial court noted that his counsel knew what they were doing and defendant did not, but if defendant chose to represent himself, that would be his call. The trial court asserted that it was in defendant's best interest for him to allow his counsel to continue to represent him. The trial court advised defendant to talk about the issues they had already discussed and that whatever issues defendant had the next day, they "certainly" could take that up. When the trial court asked defendant if he was going to keep his counsel, defendant replied that he was not. The trial court stated that the jury was about to come back in, and he advised defendant to get himself in position to address the jury.
The State subsequently asked the trial court to talk to defendant about procedure and that defendant was going to be held to the same standard. The trial court then advised defendant that he would be responsible for asking questions of the jurors and the witnesses. When the trial court asked defendant if he understood that, defendant did not reply. The trial court asked again, and defendant stated that he did not have the "proper documents." The trial court stated that counsel would be there to assist defendant.
*232 The trial court informed defendant that he would be held to the same standard that his counsel would if they were trying the case. When asked if he understood that, defendant pointed the trial court to his motion to continue. The trial court replied that he was not continuing the case as they had been there multiple times. The trial court commented that the only way the case was getting continued was if this Court or the Louisiana Supreme Court told him to continue it. The trial judge again told defendant that he would be held to the same standards as the lawyers would. He noted that there would be no assistance from the court even though defendant was representing himself. Defendant indicated he understood that. Afterwards, the trial court asked the deputy to bring in the jurors. The trial court indicated to counsel that defendant needed a change of clothes for the next day and that they should be ready to go at 9:00 a.m.
The transcript reflects that on the morning of January 22, 2018, voir dire proceedings were held and that defense counsel participated in that process. During voir dire , there was an off-the-record bench conference with "counsel" and defendant. Afterwards, the trial court advised the jurors that defendant had elected to represent himself in the instant case and that defense counsel, Mr. Bonin and Mr. Swanson, would be his advisors. Later on, defendant himself addressed the jury during voir dire stating that he had no experience with choosing a jury and did not know where to start. The trial judge told defendant this was not the time for argument and that it was time to ask questions of the jury. Defendant again stated he did not know where to start. The trial judge reminded defendant that they had "that colloquy" off-the-record and that he had made recommendations then.
Defendant then told the jurors that he was being judged for his criminal history and what he did when he was young. The State objected, and defendant said he did not know what to ask the jury. The trial judge told "counsel" and defendant to come up, after which they had an off-the-record bench conference. The trial judge then said they were going to take a brief recess. When they returned, defense counsel, Mr. Bonin, asked to approach, and another off-the-record bench conference was held. Afterwards, the trial judge told the jury that defendant was not going to be proceeding as counsel, and that Mr. Bonin and Mr. Swanson would be taking over the representation of defendant at that time. Mr. Swanson and Mr. Bonin continued the voir dire process.
The next morning, on January 23, 2018, voir dire continued. Mr. Swanson introduced himself and told the jury that he and Mr. Bonin were representing defendant. After the jury was chosen, the State presented its opening statement, and defense counsel presented one as well. The transcript indicates, thereafter, that the State and defense counsel stipulated to defendant's prior convictions and that defense counsel handled objections to the evidence and the cross-examination of the witnesses during trial. On January 26, 2018, the State gave its closing argument, after which an off-the-record bench conference was held. The transcript also reflects that there was a side-bar conference off the record between defendant and defense counsel and that a recess was then taken. Later in the day, defense counsel gave his closing argument.
The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution give a defendant in a criminal prosecution the right to represent himself. However, because an accused managing his own defense *233 relinquishes many of the traditional benefits associated with the right to counsel, he must knowingly and intelligently forego those benefits in order to represent himself. Faretta v. California , 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
A waiver of counsel, in order that an accused may enter into self-representation, must be clear and unequivocal. State v. Ormond , 00-1371 (La. App. 5 Cir. 4/24/01), 786 So.2d 187, 191. Requests which vacillate between self-representation and representation by counsel are equivocal. State v. Leger , 05-0011 (La. 7/10/06), 936 So.2d 108, 147, cert. denied , 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). A defendant who vacillates between self-representation and representation by counsel cannot be said to have waived his right to learned counsel. State v. LaGarde , 07-288 (La. App. 5 Cir. 10/30/07), 970 So.2d 1111, 1119, writ denied , 07-2412 (La. 5/16/08), 980 So.2d 706.
The right to self-representation is not absolute. A defendant must voluntarily and intelligently reject representation by an attorney and elect to conduct his own defense and must do so in a timely manner. Martinez v. Court of Appeal of California , 528 U.S. 152, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000). Once a defendant has clearly requested to represent himself, the trial court must determine whether the defendant is competent to waive counsel and is "voluntarily exercising his informed free will." State v. Santos , 99-1897 (La. 9/15/00), 770 So.2d 319, 321 (quoting Faretta , 422 U.S. at 835, 95 S.Ct. at 2541.) The competency at issue is a defendant's competence to waive the right to counsel and not his competence to represent himself. Santos , at 321.
In accepting a waiver of counsel, the trial court should advise the defendant of the nature of the charges, the penalty range for the charges and of the dangers and disadvantages of self-representation, such as the failure to recognize objections to inadmissible evidence and the inability to adhere to technical rules governing trials. State v. Strain , 585 So.2d 540, 542-43 (La. 1991). Additionally, the trial court should inquire into the defendant's age, education, and mental condition and should determine according to the totality of circumstances whether the accused understands the significance of the waiver. Id. at 542. In order to sufficiently establish on the record that the defendant is making an intelligent and knowing waiver, the inquiry should involve more than an interchange of "yes" or "no" responses from the defendant. Id.
There is no inflexible criteria or magic-word formula for determining the validity of a defendant's waiver of the right to counsel. Rather, the validity of the waiver must take into account the totality of the circumstances in each case. State v. Stevison , 97-3122 (La. 10/30/98), 721 So.2d 843, 844-45. The failure of the trial court to secure a valid waiver of counsel constitutes reversible error. State v. Price , 96-680 (La. App. 5 Cir. 2/25/97), 690 So.2d 191, 196.
Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each case. Leger , 936 So.2d at 147-48. The trial court is given much discretion in determining whether the defendant's waiver was knowing and intelligent. LaGarde , 970 So.2d at 1120. An appellate court should not reverse the trial court ruling absent an abuse of its discretion. Id.
Unlike the right to counsel, the right of self-representation can be waived by the defendant's mere failure to assert it.
*234 Brown v. Wainwright , 665 F.2d 607 (5th Cir. 1982). If on arraignment an indigent defendant stands mute, neither requesting counsel nor asserting the right of self-representation, an attorney must be appointed. Even if a defendant requests to represent himself, however, the right may be waived through the defendant's subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether. Wainwright , 665 F.2d at 611 (citing Chapman v. United States , 553 F.2d 886, 893, n. 12 (5th Cir. 1977) ; United States v. Bennett , 539 F.2d 45 (10th Cir. 1976), cert. denied , 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976) ; United States v. Montgomery , 529 F.2d 1404 (10th Cir. 1976), cert. denied , 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976) ). In Bennett , the Tenth Circuit held that the defendant waived his right to proceed pro se by asserting vacillating positions on his request continuing until shortly before trial. Id. , 539 F.2d at 51. In Montgomery , the same court held that the defendant waived his right when after requesting permission to represent himself, he allowed appointed counsel to plea bargain on his behalf and accepted the terms of the bargain. Id. , 529 F.2d at 1406.
The right of self-representation, then, is waived if not asserted, while the right to counsel is not. Since the right of self-representation is waived more easily than the right to counsel at the outset, before assertion, it is reasonable to conclude it is more easily waived at a later point, after assertion. A waiver may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself. Wainwright , 665 F.2d at 611.
In Wainwright , supra , the United States Fifth Circuit Court of Appeal held that although the defendant notified the court prior to trial that he preferred to represent himself, he later waived his right to self-representation by permitting his appointed counsel to conduct his defense and by not asserting a desire to represent himself until late in trial.
In the instant case, defendant initially stated that he wanted to represent himself; however, his appointed counsel thereafter conducted his defense. There does not appear to be any formal withdrawal of his request to represent himself in the record. The transcript of the voir dire proceedings shows that defendant had trouble questioning the potential jurors, after which an off-the-record bench conference was held, and defendant's two attorneys began representing defendant again and continued to do so throughout the trial. In light of the foregoing law, we find that defendant waived his right to self-representation by permitting his appointed counsel to conduct his defense and by not asserting a desire to represent himself. This assignment of error is without merit.
ERRORS PATENT REVIEW
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, State v. Oliveaux , 312 So.2d 337 (La. 1975), and State v. Weiland , 556 So.2d 175 (La. App. 5th Cir. 1990). Upon review, the following errors have been detected.
Post-Conviction Relief Advisal
The transcript reflects that the trial judge advised defendant that he had "two years from the time of the finalization of this sentence" to seek post-conviction relief. The sentencing minute entry reflects that the trial judge advised defendant that he had "two (2) years after judgment of conviction and sentence has become final" to seek post-conviction relief. The transcript prevails. State v. Lynch , 441 So.2d 732, 734 (La. 1983). The failure of the trial judge to advise a defendant that the prescriptive period for seeking post-conviction relief runs from the time *235 his conviction and sentence become final renders the advisal incomplete. State v. Grant , 04-341 (La. App. 5 Cir. 10/26/04), 887 So.2d 596, 598.
It is well settled that if a trial court provides an incomplete advisal pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief. See State v. Neely , 08-707 (La. App. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied , 09-0248 (La. 10/30/09), 21 So.3d 272. Accordingly, we advise defendant by way of this opinion that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. See State v. Allen , 17-685 (La. App. 5 Cir. 5/16/18), 247 So.3d 179, 192, writ denied , 18-1042 (La. 11/5/18), 255 So.3d 998.
Mandatory Fine
The transcript reflects that the trial judge failed to impose the mandatory fine of not less than $ 1,000.00 nor more than $ 5,000.00 for count three as required by La. R.S. 14:95.1(B). While an appellate court has the authority to correct an illegal sentence, this authority is permissive rather than mandatory. La. C.Cr.P. art. 882. Defendant is indigent, as evidenced by his representation by the Louisiana Appellate Project. Therefore, even though defendant's sentence is illegally lenient because of the lack of a fine, we decline to disturb defendant's sentence on count three. See State v. Parnell , 17-550 (La. App. 5 Cir. 5/16/18), 247 So.3d 1116, 1125.
CONCLUSION
For the foregoing reasons, defendant's convictions and sentences are affirmed.
AFFIRMED

The State indicated that it was not seeking the death penalty. This Court has jurisdiction of first degree murder cases where the death penalty was not imposed. See La. C.Cr.P. art. 912.1(A)(1) and (B)(1).

Because the witness was a minor, his initials will be used to protect his identity. See State v. Winston , 02-1161 (La. App. 5 Cir. 3/25/03), 844 So.2d 184, 187 n.1, writ denied , 03-1284 (La. 11/14/03), 858 So.2d 419.

Arnell Kimbrough testified that Mr. Kimbrough was her brother; that he lived on "Idaho" with his girlfriend, Ms. Scott; that there were three children in the house; and that Mr. Kimbrough was the father of the youngest child, who was two weeks old when Mr. Kimbrough was killed. She learned from "George Fisher" that Mr. Kimbrough was with defendant the night before the homicides and noted that the car Mr. Fisher described was defendant's car. Ms. Kimbrough provided all of that information to the police.

Sergeant Rohde testified that a phone was found partially under the female victim's body, but he could not do an "extraction" on it. He later testified that he was provided with phones seized from 329 Pat Drive in Avondale, defendant's residence, and that he extracted data from them.

Ricardo Leal testified that he worked for Sprint Telecommunications Corporation as a records custodian and analyst. He received a request from the Kenner Police Department for records pertaining to defendant's telephone number from March 1 through April 4, 2016, and for cell tower information, which he produced.

Sergeant Adam Schouest testified that he collected surveillance footage from 2211 Illinois Avenue in Kenner, which was near the crime scene.

Jeffrey Hebert testified that in April of 2016, he was living at 333 Pat Drive in Avondale next door to 329 Pat Drive. He had surveillance cameras at the four outside corners of his house. In April of 2016, the police arrived and took the recorder with them. He noted that the time on the recorder was not correct as he had never set it. Mr. Hebert explained that the surveillance cameras had night vision and were activated by motion.
Sergeant Adam Schouest testified that in April of 2016, he assisted with retrieving and downloading video surveillance from the house next door to 329 Pat Drive. The cameras showed the front area of 329 Pat Drive. Sergeant Schouest explained that there was an approximate two-hour time difference between real time and the time on the surveillance cameras.

Bradrika Brown testified that on the night of April 3, 2016 into April 4, 2016, she was working with "Montana" at New Orleans Original Daiquiris on Highway 90 in Avondale. She stated that the daiquiri shop had video surveillance cameras inside. Ms. Brown recalled speaking to officers about two individuals who were inside the daiquiri shop from late Sunday night, April 3, to the early morning hours of Monday, April 4. Sergeant Schouest stated that he collected surveillance footage from the New Orleans daiquiri shop on Highway 90 in Avondale.

Detective Wesley Doyle of the JPSO testified that on April 4, 2016, he obtained search warrants for a vehicle and the residence at 329 Pat Drive.

Brittney Bergeron, a forensic interviewer with the Jefferson Children's Advocacy Center, testified that she interviews children who have alleged physical or sexual abuse or who have witnessed violent crimes. She testified that she conducted a forensic interview with D.S. on April 12, 2016, which was played for the jury. What D.S. said in the interview was similar to D.S.'s trial testimony.

Lucy Camarena, a DNA analyst, later referred to the camouflage jacket as a camouflage shirt.

Ms. Jack initially testified that she heard the noises at approximately 6:25 a.m. She later testified that she heard the "booms" between approximately 6:30 and 6:40 a.m., "something like that." Ms. Jack explained that she was not looking at her watch each time she heard "booms."

Blanche Mannino testified that in April of 2016, she was leasing 2144 Idaho Avenue, Apartment D, to Mr. Kimbrough. February 26, 2016 was Mr. Kimbrough's move-in date. She recalled that the police told her the apartment had been burglarized on April 17, 2016. She had a maintenance person repair the back door and a broken window.

Detective Mancuso testified that defendant's license plate was captured on April 4, 2016 at 5:15:01 a.m., 1:53:53 a.m., and at 1:54:17 a.m. at Clearview and Earhart; at 3:24:53 a.m. and 6:42:12 a.m. at Huey P. Long and Clearview west; at 5:09:05 a.m. and 1:48:16 a.m. at Huey P. Long and Highway 90 east; at 10:10:35 a.m. and 1:00:17 a.m. at Nicolle and Lapalco; and at 9:36:15 a.m. at Westwood.

Mr. Dwight testified that on April 3, 2016 at 11:00 p.m., there was an incoming call that occurred on cell tower 4572/5572 just east of the daiquiri shop and Pat Drive; on April 4, 2016 at 12:27 a.m., there was a call on the same tower; on April 4, 2016 at 12:43 a.m., there was a call on tower 5560 near Nicolle and Lapalco; at 1:00:17, the license plate was captured by a traffic camera at Nicolle and Lapalco; and at 1:48 a.m., the license plate was captured by a traffic camera on Highway 90 eastbound.
Mr. Dwight also testified that from 2:16 a.m. to 2:55 a.m., there were calls made near the airport which included the area of the crime scene; at 3:28 a.m., there was a call on tower 4560; at 3:29 a.m., there was a call on towers 4572/5572 near the daiquiri shop and Pat Drive; and from 3:48 a.m. to 4:15 a.m., there were calls on tower 4560, the same tower southwest of Pat Drive and the daiquiri shop.
Mr. Dwight indicated that at 5:09 a.m., a traffic camera captured the license plate at Huey P. Long and Highway 90 eastbound; at 5:15 a.m., a traffic camera captured the license plate at Clearview and Earhart; at 5:18 a.m. and 5:23 a.m., there were calls on tower 5637; at 5:36 a.m. and 6:07 a.m., "undetermined/routed" calls came in from "Dominque Barnes" but he did not have any more information about them. At 6:40 a.m., a call started in sector three which was north of tower 4578 and ended in sector two, which was south of the tower site on the Westbank; at 6:42 a.m., a traffic camera captured the license plate at Huey P. Long and Clearview westbound; from 7:28 a.m. to 8:30 a.m., calls came from a tower on the Westbank; at 9:36 a.m., a traffic camera captured the license plate on the Westwood down ramp on the Westbank Expressway; and between 9:54 a.m. and 10:48 a.m., there were calls from two towers in the area of the daiquiri shop.

The State's notice is sealed in the instant case; however, it was attached to defendant's prior writ application in 18-K-22, where it was not sealed. According to U.R.C.A. 2-1.14, "[a]ny record lodged in this court may, with leave of court, be used, without necessity of duplication, in any other case on appeal or writ." See State v. Bradley , 02-1130 (La. App. 5 Cir. 3/11/03), 844 So.2d 115, 118.

Defendant did not proffer the results of his polygraph test. As such, it is unclear as to whether he actually passed a polygraph test. Nevertheless, defense counsel represented that defendant passed a polygraph test with respect to the 2007 murders.

The assignments are addressed together because they are related.

La. C.Cr.P. art. 642 provides that the defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. It does not appear that this motion has to be in writing.

Faretta v. California , 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).